## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| SHERMAN/GRAYSON HOSPITAL, LLC, a Delaware limited liability company, [1] | Case No. 23-10810 (__) |
| Debtor. | |

## DECLARATION OF MICHAEL SARRAO, EXECUTIVE VICE PRESIDENT OF SHERMAN/GRAYSON HOSPITAL, LLC,  IN SUPPORT OF FIRST DAY MOTIONS

I, Michael Sarrao, declare and state as follows:

1.     I am the Executive Vice President for Sherman/Grayson Hospital, LLC,  a Delaware limited liability company (the "Debtor") that has filed a voluntary petition (the "Chapter 11 Petition") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing this Chapter 11 case (the "Case").

2.     To minimize the adverse effects of filing the Chapter 11 Petition while at the same time maximizing value for the benefit of stakeholders, the Debtor has filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings").  I submit this Declaration in support of the Chapter 11 Petition and the First Day Pleadings.  I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and maximize recoveries; and (c) best serves the Debtor's estate and creditors' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of this Chapter 11 case.

---

[1]  The last four digits of the Debtor's federal tax identification number are 5690. The Debtor's address is 500 N. Highland Avenue, Sherman, Texas 75092.

3.      I have served as the Debtor's executive vice president since November 1, 2014. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management or the Debtor's professionals that I believe in good faith to be reliable; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  The Debtor has authorized me to submit this Declaration.

4.      I am also personally familiar with the Debtor's records submitted in support of the First Day Pleadings.  The Debtor's records are made by employees or agents of the Debtor who report to me and who have a business duty to enter the records of the Debtor accurately and at or near the time of the event which they record.  In general, the Debtor retains its files electronically in its computer system.

5.      This Declaration is divided into four parts.  Part I sets forth an executive summary. Part II provides an overview of the Debtor's business, its corporate structure, its recent financial performance, and its prepetition indebtedness.  Part III discusses the circumstances surrounding the commencement of this Chapter 11 case and the Debtor's proposed path forward.  Finally, Part IV sets forth relevant facts in support of the First Day Pleadings.

## I.      <u>EXECUTIVE SUMMARY</u>

6.      The Debtor is the operator of Wilson N. Jones Regional Medical Center ("<u>WNJ</u>"), a 207-bed acute care hospital located in Sherman, Texas. Sherman has a population of around 45,000 people and is located within Grayson County, Texas which is approximately 75 miles from Dallas, Texas. Among other things, WNJ contains an emergency department, medical surgical units, an intensive care unit, and a behavioral health unit.

7.      As discussed in further detail below, the Debtor has faced significant financial challenges both during and after the COVID-19 pandemic. As a result of such challenges, the Debtor is currently operating at a loss of over $1,000,000.00 per month.

8.      Consequently, the Debtor has devoted substantial efforts to locate a buyer for WNJ. On June 19, 2023, the Debtor entered into an asset purchase agreement with AHS Sherman, LLC ("AHS-Sherman") whereby the Debtor will transfer substantially all of its assets to AHS-Sherman and AHS-Sherman will assume certain liabilities and obligations of the Debtor. AHS Sherman is not an insider or affiliate of the Debtor.  This transaction is discussed in greater detail below.

9.      If the Debtor is unable to complete the sale of its assets to AHS-Sherman, the Debtor will be forced to suspend all patient care services at WNJ and otherwise cease operations. The practical effect of this would be severe. First, approximately four-hundred healthcare workers employed by the Debtor will be furloughed. Second, patients, including many uninsured and underinsured patients who rely on the Debtor and WNJ to meet their healthcare needs, will be deprived of access to care. Finally, the Sherman community will lose access to acute care hospital services and inpatient behavioral health services.

10.     The Debtor files this Case to complete the sale process to AHS-Sherman discussed in further detail below. Upon the completion of such sale process, the Debtor intends to discontinue operations, liquidate any remaining unsold assets, and windup its estate.

## II.    OVERVIEW OF THE DEBTOR'S BUSINESS

### A.    Organizational Structure

11.     The Debtor is a Delaware limited liability company with its headquarters in Sherman, Texas.

12.     The Debtor is owned 100% by Alecto Healthcare Services Sherman LLC ("Alecto Sherman"). Alecto Sherman acquired the Debtor in October 2014. Alecto Sherman is owned 80% by Alecto Healthcare Services LLC and 20% by MPT of Sherman-Alecto, LLC ("MPT Sherman").

13.     Alecto Healthcare Services LLC is the debtor in a bankruptcy case pending in this District, Case No. 23-10787-JKS.

### B.    The Debtor's Business Operations

14.     In the ordinary course of business, the Debtor bills and collects for the provision of patient care services at WNJ.

15.     The Debtor owns the equipment and furniture used in the operations of WNJ, leases a few specialized pieces of equipment from third-party equipment lessors, and contracts with third-party vendors for supplies and services utilized by WNJ.

16.     The Debtor is a party to a lease agreement (as amended from time to time, the "Lease Agreement") with MPT Sherman. Pursuant to the Lease Agreement, MPT Sherman leases all of the real property and improvements used in the operation of WNJ to the Debtor in exchange for quarterly lease payments. The Lease Agreement's term expires on December 31, 2026.

17.     In the course of operating WNJ, the Debtor employs approximately four hundred employees (the "Employees"). The table below summarizes how the population of Employees are distributed across the Debtor's operations:

| Department/Segment | Approximate Number of Employees |
|---|---|
| Accounting | 2 |
| Administration | 4 |
| Admitting | 16 |
| Behavioral Health Unit | 25 |
| Cardiac Cath Lab | 5 |
| Cardiac Rehab | 1 |
| Case Management | 6 |
| Central Scheduling | 3 |
| Central Sterile | 1 |
| Communications/PBX Operators | 5 |
| Dietary | 20 |
| Education | 1 |
| Emergency Services/Department | 33 |
| Grayson County Health Clinic | 12 |
| Health Information Management | 3 |
| Human Resources | |
| Housekeeping | 17 |
| Information Technology | 4 |
| Laboratory | 16 |
| Materials Management | 5 |
| Medical Staff | 2 |
| Medical/Surgical Units | 66 |
| Nuclear Medicine | 1 |
| Nursing Administration | 5 |
| Patient Financial Services | 7 |
| Performance Improvement/Quality | 6 |
| Plant Operations | 7 |

| | |
|---|---|
| Pharmacy | 14 |
| Radiology | 25 |
| Respiratory Therapy | 9 |
| Security | 9 |
| Surgery – Inpatient and Outpatient | 22 |
| Surgical ICU | 16 |
| Therapy – Speech, Physical, Occupational | 16 |
| Trauma | 2 |
| Wound Care | 2 |
| Total | 393 |

## C.    Recent Financial Performance

18.     In 2020, the Debtor had net income of $1,548,000 largely due to the receipt of supplemental funding from the federal government associated with the COVID-19 pandemic.

19.     In 2021, the Debtor had an operating loss of $3,557,000 but had positive net income as a result of a favorable adjustment to the Lease Agreement which resulted in non-operating revenue that did not result in any additional cash flow to the Debtor.

20.     In 2022, the Debtor's annual net revenue was $42,515,343 with a net loss of $17,942,477.

21.     In 2023, through March 31, 2023, net revenue was $10,766,000 with a net loss of $2,341,000.

## D.    The Debtor's Prepetition Indebtedness

Secured Debt

22.     MPT Sherman has a security interest in all assets of the Debtor on account of the Lease. MPT Sherman is currently owed approximately $956,000 for unpaid capital reserves due under the Lease Agreement and a pre-petition advance under the Lease Agreement.

23.     The IRS has tax liens against all of the Debtor's property. The tax liens total approximately $1,000,000. The Debtor pays the IRS monthly payments of $23,000 in satisfaction of the tax liens.

24.     Dell Financial Services, LLC ("Dell") and the Debtor are parties to a financed computer equipment lease. Pursuant to such lease, Dell filed a UCC statement against the computer

servers leased to the Debtor. Dell is owed approximately $9,700 under the computer equipment lease.

25.     Midland States Bank has a security interest in a piece of radiology equipment that the Debtor financed. Midland States Bank is owed $351,812.50.

26.     Finally, US Foods, Inc. ("US Foods") is a food and supplies vendor to the Debtor. US Foods is owed $93,574.74 and has a secured interest in certain of the Debtor's personal property.

Unsecured Debt

27.     The Debtor has approximately three hundred fifty (350) unsecured creditors totaling approximately $85,000,000.

28.     The total claims of the twenty largest unsecured claims is approximately $18,000,000 subject to defenses and counterclaims of and by the estate.

29.     There are eight (8) formal legal actions involving/against the Debtor pending as of the Petition Date:

- *Booe v. Alecto Healthcare Services, et al*, United States District Court for Eastern District of Texas Case No. 4:22-cv-00110-ALM.

- *Medely, Inc. v. Sherman/Grayson Health Services, LLC and Sherman/Grayson Hospital, LLC*, 15th Judicial District of Grayson County Cause No. CV-22-1421.

- *Fisher v. Sherman/Grayson Hospital, LLC dba Wilson N. Jones Regional Medical Center*, 397th Judicial District of Grayson County Cause No. CV-20-1265.

- *HHS1, LLC v. Sherman/Grayson Hospital, LLC dba Wilson N. Jones Regional Medical Center*, 101st Judicial District of Dallas County Case No. DC-23-07437.

- *Datasearch, Inc. v. Sherman/Grayson Hospital, LLC dba Wilson N. Jones Regional Medical Center*, JAMS Arbitration Proceeding.

- *United States of America v. Olympia Health Care, LLC, et. al.*, United States District Court for the Central District of California Case No. 2:23-cv-01783.

- *Clausen v. North Texas Comprehensive Cardiology, PLLC and Sherman/Grayson Hospital, LLC*, 59th Judicial District of Grayson County Cause No. CV-22-1134.

- *Long v. Michael W. Spagnuolo, Michael Spagnuolo DO PLLC, Alecto Healthcare Services Sherman LLC, and Wilson N. Jones Regional Medical Center*, 15th Judicial District of Grayson County Cause No. CV-22-0752.

## III.  **EVENTS LEADING TO THE CHAPTER 11 CASE AND PATH FORWARD**

30.    The Debtor is currently in a liquidity crisis. The Debtor is maintaining only minimally required levels of supplies, has had to limit the availability of certain services, and can no longer continue to pay the costs necessary to operate.

### **Circumstances Leading to Financial Condition of the Debtor**

31.    The COVID-19 pandemic caused substantial increases in the costs necessary to operate acute care hospitals like WNJ. While the Debtor was able to partially offset the resulting losses with supplemental funding from the federal government available during the COVID-19 pandemic, such funding is no longer available, and the Debtor can no longer partially offset these increased costs.

32.    During the COVID-19 pandemic, one program which provided the Debtor with the supplemental funding it needed was the Medicare Advance Payment Program whereby Medicare advanced payments to the Debtor. While the Debtor needed such funds to survive, presently, the Debtor is required to pay $163,458.89 each month to repay the advances it received under this loan program. These repayment amounts are deducted from the Debtor's Medicare payments and reduce the Debtor's cash collections each month.

33.    Affiliates of the Debtor also provided advances to the Debtor to help partially address its cash flow issues, but these affiliates have exhausted their reserves providing support for the Debtor and no longer have the ability to support the Debtor with advances.  As a result, the Debtor has been forced to rely solely on its collections to meet its expenses and its collections have fallen short of the amount required to meet its expenses.

34.    Although it has been approximately three years since the peak of the COVID-19 pandemic, patient numbers have not returned to pre-pandemic levels. The Debtor's sole source of income is payment for patient services. The decrease in patients has caused liquidity and cash flow issues for the Debtor.

35.     Due to a lack of available funds to meet its expenses, in late March 2023, the Debtor was unable to pay the staffing costs to staff a medical surgical unit that treated patients suffering medical conditions associated with withdrawal symptoms from alcohol or drugs. As a result, the company that provided the staffing stopped providing the necessary staff to operate the unit and WNJ's patient volumes and revenue associated with such services has been eliminated.  This unit had an average daily census (the average number of patients in the unit each day) of 12 to 15 which represented approximately 25% of the overall inpatients at WNJ on any particular day.  This unit also generated approximately 12-16% of the net revenue of WNJ each month.

36.     The Debtor previously contracted with a third-party firm to assist it in billing and collecting for services provided by the Debtor. On May 22, 2023, this third-party firm terminated its contract due to non-payment, which has adversely impacted the Debtor's collections.  Since the third-party terminated its contract, the Debtor's Employees in the Patient Financial Services Department have been performing the billing and collection services and the Debtor has been cross-training other Employees to provide assistance.

37.     On May 1, 2023, the Debtor went live with an upgraded electronic medical records ("EMR") system. The process to upgrade the electronic medical records system delayed the Debtor's ability to bill for services provided by the Debtor which delayed collections, further worsening the Debtor's precarious financial position.  The implementation of a new EMR system was necessary because WNJ's EMR system was outdated and created inefficient workflows for the Debtor's Employees and the physicians who treat patients at WNJ. Work related to the implementation of the new EMR system had been in process for more than fifteen (15) months and had suffered delays caused by the software provider.  Ultimately, May 1, 2023 was chosen as the "go-live" date so that WNJ could start using the new EMR system and eliminate the inefficient workflows with the expectation that the new EMR system would allow more patients to be treated at WNJ.

38.     Due to its current financial condition, impacted by its delay in billing and collection described above, the Debtor has been unable to secure a working capital loan.  In an effort to secure

a working capital loan, the Debtor's executives engaged in discussions with several lenders, including the lender who most recently provided a revolving credit facility under which Debtor was a co-borrower. The lenders reached out to by the Debtor provide revolving credit facilities backed by a hospital's accounts receivable. These efforts were unsuccessful as no lender was willing to provide a working capital loan against the receivables in light of the Debtor's financial condition, the amount remaining to be paid to repay the Medicare Advance Payment Program, and existing litigation.

39.    On May 16, 2023, judgment creditor Medley, Inc. ("Medley") filed a writ of garnishment in the District Court of Grayson County, Texas against the Debtor's bank accounts at Bank of America in the amount of $1,734,388.71 plus post-judgment interest at the rate of 7.75% per annum. On or about May 24, 2023, the Debtor and Medley entered into a forbearance agreement whereby Medley agreed to forbear from collection until and including June 25, 2023 (the "Forbearance Period"). On June 25, 2023 when the Forbearance Period ends, the Debtor expects Medley will place a garnishment hold on the Debtor's bank accounts.

**Sale Process**

40.    Given the financial challenges outlined above, the Debtor has devoted substantial efforts over the past three (3) years to locate a buyer or strategic partner for WNJ. These efforts have included, without limitation, the following:

a.    In 2019, the Debtor engaged Bank of America Merrill Lynch ("BAML") to develop a confidential information memorandum and identify parties who may be interested in acquiring or investing in WNJ. Representatives of BAML spoke with at least 10 different parties, including large for profit and nonprofit health systems with a presence in the Dallas market, as well as other health systems with a presence in Texas. The health systems contacted by BAML were not interested in acquiring or investing in WNJ. The Debtor and its affiliates also introduced parties to BAML who had expressed an interest in acquiring or investing in WNJ, including parties

that did not own or operate hospitals but had expressed an interest in acquiring a hospital. BAML engaged in discussions with these parties and attempted to move these parties towards executing a letter of intent, but ultimately these efforts were not successful. The Debtor and BAML believed that the owner of the other large acute care hospital in Grayson County, Texas may be interested in acquiring WNJ but also understood this party may have anti-trust concerns. That is, the Debtor and BAML believed that the party would be concerned that such a transaction would not survive antitrust scrutiny, In order to proactively address these concerns, the Debtor's transaction counsel engaged the services of an economist who evaluated whether an acquisition of WNJ by another hospital located in Grayson County, Texas would survive antitrust scrutiny. This evaluation suggested that such an acquisition would not be possible. Faced with this evaluation and for other internal reasons, the owner of the other acute care hospital indicated it was not interested in pursuing a transaction to acquire WNJ. During the time that the Debtor engaged BAML to assist in locating a buyer for WNJ, the BAML team was led by J. Brent McDonald, a seasoned healthcare executive. Prior to BAML, Mr. McDonald had served in leadership roles at Tenet Healthcare and was responsible for Tenet Healthcare's acquisition and divestiture strategy for numerous hospitals. As part of his work at Tenet Healthcare, Mr. McDonald developed extensive relationships with development executives at hospitals or health systems across the State of Texas and the United States. Mr. McDonald accessed these relationships to identify potential buyers and the interest level of potential buyers.

b. Over the past two (2) years, the Debtor's executives have engaged in discussions with at least five (5) different health systems with locations

within 90 miles of WNJ to determine if they had an interest in acquiring or investing in WNJ.  Each of these health systems indicated that they were not interested in acquiring or investing in WNJ.  The Debtor's executives have also engaged in discussions with two (2) operators of single hospitals in Texas to determine if they had an interest in investing or acquiring WNJ.  Both of these operators indicated that they were not interested in acquiring or investing in WNJ.  The Debtor also spoke to a large Indian Nation and other parties to determine if the Indian Nation would be interested in investing in WNJ, but they also declined.

c.   Amongst others, the Debtor representatives and executives involved in the marketing and sale process of WNJ have included: (1) me; (2) Laxman (Lex) Reddy; and (3) local management at WNJ.

   i.   Mr. Reddy undertook extensive efforts to identify parties interested in acquiring WNJ.  Mr. Reddy has been involved in healthcare since 1985 and has held senior leadership positions since 1990.  Mr. Reddy has been personally involved in the purchase or sale of more than 30 acute care hospitals.  Mr. Reddy served as President and CEO of one of the largest for-profit healthcare systems in the United States for more than 10 years and lead the acquisition of more than 20 acute care hospitals and developed an extensive network of relationships with other executives at health system and hospitals across the United States.  Mr. Reddy also served as a senior executive at one of the largest physician management companies in the country.  Mr. Reddy has also developed extensive relationships with investment bankers and lenders involved in healthcare and hospitals throughout the United States.  Mr. Reddy tapped his network of executive relationships at various hospitals and health

systems in the efforts to locate a buyer for WNJ.  Mr. Reddy engaged in communications with executives at the health systems and hospitals mentioned in this Declaration.

ii.  I was also involved in efforts to identify parties interested in acquiring WNJ and provided interested parties with information about WNJ as well as engaged in discussions with parties who may be interested in acquiring WNJ.  I have practiced healthcare law for more than 20 years and have been involved in more than 25 transactions involving the purchase or sale of hospitals or health systems including several hospitals in the State of Texas.

iii.  Local management at WNJ engaged in discussions with the aforementioned Indian Nation about their interest in WNJ as they have an interest in the community, are significant utilizers of healthcare, and WNJ is named after one of the former leaders of such Indian Nation.

41.    After its initial efforts to find a buyer or strategic partner were unsuccessful, the Debtor redoubled its efforts over the past nine (9) months.  The Debtor identified four (4) groups that expressed an interest in acquiring WNJ. Group 1 consists of executives with experience operating hospitals who were looking to acquire a hospital.  Group 2 is a healthcare company that was looking at acquiring its first hospital in the State of Texas.  Group 3 is a healthcare investment company that operates a hospital in Texas.  Group 4 is AHS-Sherman. I believe that there are no other interested parties and any continued marketing will not result in new parties being interested in acquiring or investing in WNJ.

42.    After engaging with each of these groups, the Debtor ultimately determined, in the reasonable exercise of its business judgment, that AHS-Sherman is the only legitimate potential buyer for the Debtor's assets and that proceeding with AHS-Sherman is in the best interest of the Debtor and its stakeholders because:

a. While Group 1 has conducted significant due diligence over the past 90 days, Group 1 is not ready to execute an asset purchase agreement, to manage WNJ on an interim basis, or to provide funding to WNJ while it operates WNJ on an interim basis. The Debtor requires immediate funding, which Group 1 is neither able nor willing to provide.

b. Group 2 has conducted due diligence and developed a plan which would require the Debtor to scale down the operations of WNJ so that Group 2 may purchase WNJ with scaled down operations. In order to scale down operations, WNJ would be forced to furlough employees and incur costs associated with such furloughs while continuing to operate WNJ during the time necessary to scale down the operations. The Debtor lacks the funds necessary to continue to operate WNJ much less to scale down the operations and to furlough employees. Group 2 was not willing to provide the funding necessary for the scale down.

c. Group 3 expressed an interest in acquiring WNJ and conducted due diligence, but it needs to devote its attention to the other hospital it operates at this time rather than proceed with an acquisition of WNJ.

d. AHS-Sherman was identified as a potential buyer for WNJ as it had recently acquired distressed hospitals and the Debtor believed AHS Sherman had the experience and ability to expeditiously complete the transaction. AHS-Sherman has expeditiously conducted due diligence and negotiated the terms of an asset purchase agreement and an interim management agreement. AHS-Sherman has experienced operators that have previously acquired distressed hospitals like WNJ and it has agreed to immediately assume management of WNJ on an interim basis and to provide funding without recourse to the Debtor while it manages WNJ before it acquires WNJ. AHS-Sherman has also promptly reached agreements with MPT

Sherman, the owner of the real estate and improvements on which WNJ is located.

43.     Given the Debtor's seemingly unsurmountable financial challenges and its exhaustive search for a buyer/operator for WNJ, on June 19, 2023, the Debtor and AHS-Sherman entered into an asset purchase agreement (the "APA" or "Asset Purchase Agreement") subject to Court approval. The APA has been extensively negotiated between the parties at arm's length and in good faith. The APA contemplates a sale of substantially all of the assets of the Debtor ("Assets"). In order to minimize administrative expense in this Case, maximize creditors' recoveries, and ensure that the Debtor can fund time-sensitive and critical expenses, the Debtor will file shortly file a sale motion seeking approval of the APA (the "Sale Motion") to ensure that the APA is approved as quickly as possible so that the sale of the Assets may close. The terms of the APA and sale process are set forth in further detail below and in the Sale Motion.

44.     Significantly, the APA contemplates that AHS-Sherman will: (1) retain all the Employees of the Debtor;  and (2) assume over $10 million  of the Debtor's liabilities.

45.     In order to ensure stability in the Debtor's operation during this Case, AHS-Sherman has  entered into a management services agreement  (the "Interim Management Agreement") whereby AHS-Sherman assumed the management of WNJ effective  June 21, 2023.

46.     Pursuant to the Interim Management Agreement, AHS-Sherman is responsible for, with the benefit of any collections received by the Debtor, funding all of the Debtor's operations and other administrative obligations of WNJ and this Case.

47.     To help facilitate the transaction with AHS-Sherman, MPT Sherman has agreed to provide a $1,000,000.00 postpetition debtor-in-possession credit facility (the "DIP Credit Facility") subject to Court approval. The principal terms of the DIP Credit Facility are described in more detail below and in the Motion of Debtor Pursuant To Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, For Interim and Final Orders (I) Authorizing Debtors To Obtain Postpetition Financing And Use Cash Collateral; (II) Granting Liens And Super-Priority Claims And Adequate Protection; (III) Scheduling A Final

Hearing; (IV) Modifying The Automatic Stay; and (V) Granting Related Relief (the "DIP Motion") and in my declaration in support of the DIP Motion.

## IV.    FIRST DAY PLEADINGS

48.    Concurrently with the filing of this Case, the Debtor filed the First Day Pleadings seeking relief related to the administration of this Case, the Debtor's operations, and the Debtor's creditors and employees.  Below is a list of the First Day Pleadings:

a.    Motion for an Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code (the "Cash Management Motion");

b.    Motion for Order Authorizing Payment of Prepetition Employee Wages, Benefits and Associated Expenses and Granting Related Relief (the "Wage Motion");

c.    Application of Debtor for Order: (I) Authorizing the Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent to Debtor; and (II) Granting Related Relief (the "Claims Agent Application").

d.    Motion for Order Under Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or discriminating against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance (the "Utilities Motion");

e.    The DIP Motion; and

f.    The Sale Motion.

49.    The Debtor has narrowly tailored the First Day Pleadings to meet its goals of: (a) continuing its operations in Chapter 11 with as little disruption and loss of productivity as possible pending the Court's approval of the aforementioned sale process; (b) maintaining the confidence

15

and support of its key customer and employee constituencies during the bankruptcy process; and (c) establishing procedures for the efficient administration of this Case.

50.     I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on the Debtor's employees and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.[2]

51.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtor's efforts to maximize the recovery to its creditors through a sales process.

52.     The success of this Case depends upon the Debtor's ability to maintain its operations pending the sale of the Debtor's assets.  The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy and ensure that WNJ remains open and its services available to the Sherman public.

53.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted based upon the following:

**Cash Management Motion**

54.     Through the Cash Management Motion, the Debtor seeks an order authorizing it to maintain and utilize its existing cash management system (the "Cash Management System") and existing bank accounts (collectively, the "Bank Accounts") at Bank of America and Capital One (collectively, the "Banks") and to continue to use its existing business forms (letterhead, invoices, and other pre-printed forms utilized in the ordinary course of the Debtor's business) (the "Existing Forms") without reference to "Debtor in Possession" pursuant to 11 U.S.C. §§ 105(a), 345, and 363.

---

[2] To the extent any capitalized terms are not otherwise defined herein, such terms shall have the meaning set forth in the relevant First Day Pleading.

55.     The Debtor maintains the following four Bank Accounts at Bank of America: (1) a disbursement account for accounts payable (ending in 9152) ("AP Account"); (2) a payroll account (ending in 1646) ("Payroll Account"); (3) a depository account (ending in 5572) ("Depository Account"); and (4) a checking account (ending in 4404) ("Checking Account").

56.     The Debtor maintains the following two Bank Accounts at Capital One: (1) a depository account for government receivables (ending in 8191) ("Government Receivables Account"); and (2) a depository account for non-government receivables (ending in 8205) ("Non-Government Receivables Account"). The Government Receivables Account and Non-Government Receivables Account shall be referred to as the "Receivable Accounts."

57.     The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's day-to-day business operations. The Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various Bank Accounts required to effectuate the collection, disbursement, and movement of cash. Because of the nature of the Debtor's business and the disruption that would result if it was forced to close its existing Bank Accounts and establish a new cash management system, I believe it is critical that the existing Cash Management System remain in place.

58.     The Cash Management System preserves the orderly flow of cash and also permits the Debtor to accurately track deposits and disbursements. The Cash Management System facilitates the Debtor's cash monitoring, forecasting, accounting and reporting, and enables the Debtor to maintain control over the administration of its Bank Accounts. If the Bank Accounts had to be closed and new ones re-opened, the Debtor's business operations would be disrupted and the Debtor and its estate would experience material disruptions in collective receivables and incur a significant increase of administrative expenses.

59.     Given the size of the Case, requiring the Debtor to close the Bank Accounts and open new ones will materially disrupt the Debtor's operations because (a) any changes to the AP

Account will slow down the payment to crucial vendors as many are paid through electronic fund transfers; (b) any changes to the Receivable Accounts could inhibit the Debtor's ability to process and collect payments because Medicare, Medicaid, and almost all other payors pay claims for services rendered by Debtor by electronic funds transfer or ACH transfers and changes to any of the payment instructions for any of these payors will result in at least a 15 day stoppage of payments while the payors' systems are updated;  (c) any changes to its Payroll Account could disrupt and delay payment for payroll, administrative fees, and related taxes; (d) it would increase the work of the Debtor's accounting personnel, who are already dealing with the many complex and varied issues related to the Case; and (e) it would needlessly cost the Debtor time and money and would result in no discernable benefit to the Debtor's bankruptcy estate or its creditors and other parties in interest.

60.     In addition, the Debtor requests that the Banks be permitted to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for all checks drawn on the Bank Accounts which are cashed at the Banks' counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date. The Debtor further requests that the Banks be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts on account of a prepetition claim unless: (a) authorized in an order of this Court, as represented to the Banks by the Debtor as set forth below; (b) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtor; and (c) supported by sufficient funds in the Bank Account in question.

61.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor has and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (i) Bank services (the "Service Charges"), (ii) checks deposited with the Bank which have been dishonored or returned for insufficient funds in the applicable amount, and (iii) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements.

The Debtor incurs an average of approximately $1,000 per month in fees owed related to Service Charges.  The Debtor seeks authority, in its sole discretion, to pay: (i) all undisputed prepetition Cash Management Claims; and (ii) any such routine Cash Management Claims that accrue to the Bank post-petition, in a monthly aggregate amount not to exceed $1,500.

62.     In the ordinary course of business, the Debtor uses business letterhead, invoices, envelopes, promotional materials, and a number of other business forms and correspondence (collectively, the "Existing Forms").  Because the Existing Forms were used prepetition, they do not reference the Debtor's current status as a debtor in possession. The Debtor is seeking authorization to continue using all Existing Forms in the forms existing immediately prior to the Petition Date.

63.     I believe that most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the notice of the commencement of the Case being given to creditors and other parties-in-interest. Changing the Debtor's Existing Forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, such changes would be disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor.

64.     The Debtor also requests authorization to continue using its existing checks without placing the label "debtor in possession" until the existing stock has been exhausted, provided that the Debtor shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock.

65.     In connection with keeping the Bank Accounts open, the Debtor seeks an order authorizing and directing the Banks to honor transfers and prepetition and postpetition checks, if any, drawn from the Bank Accounts.  Further, in the event that the Banks refuse to honor a check drawn or a transfer made on a Bank Account maintained by the Debtor (provided there are sufficient good funds in the Bank Account to complete the transfer), the Banks must immediately turn over the deposits held in the applicable Bank Account upon the Debtor's request.

66.     In sum, the Bank Accounts and Cash Management System facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's business. Because of the disruption to the business that would result if the Debtor were forced to close these Bank Accounts, I believe it is critical that the Debtor maintain its Cash Management System and the Bank Accounts.

**Wage Motion**

67.     The Debtor filed the Wage Motion seeking the entry of an interim and final order, authorizing but not directing, the Debtor, in its discretion, to pay, continue, or otherwise honor various prepetition employee-related obligations (collectively, the "Prepetition Obligations") to or for the benefit of their current employees (individually, an "Employee" or collectively, the "Employees"), for wages, compensation, severance, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtor prior to the Petition Date (as described below, individually, "Employee Program" or collectively, the "Employee Programs") and have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests.

68.     I discussed and summarized above the Debtor's Employees. I believe it is absolutely critical that the Debtor be able to assure the Employees that their wages, compensation and salaries ("Wages") and the Employee Programs will continue unaffected by this chapter 11 filing in order to effectuate a successful outcome in the Case. Moreover, if the Debtor fails to pay the Prepetition Obligations and fails to continue the Employee Programs in the ordinary course, the Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on workforce morale and would likely result in unmanageable turnover, resulting in immediate and irreparable harm to the Debtor and its estate.

69.     Importantly, the Employees are composed of health care workers and members that ensure that WNJ is able to operate and provide patient services. I believe that payment of the

Prepetition Obligations is critical to ensure that the Debtor can continue to operate and provide patient care to the Sherman community.

70.     The Debtor paid payroll to the Employees on June 22, 2023 for the two (2) week period ending June 17, 2023.  The Employees will accrue wages and other Pre-Petition Obligations for the periods of June 18, 2023, 2023 through the Petition Date for which the Debtor seeks authority to pay post-petition in the ordinary course on July 7, 2023.  None of the Employees will receive more than the maximum amount provided for in § 507(a)(4).

71.     The Prepetition Payroll Obligations owed by the Debtor are summarized below[3]:

| Category | Amount Owed Prepetition |
|---|---|
| Employee Wages (accrued but unpaid) (6/18 – 6/22/23) | $202,441 |
| PTO, Vacation, Sick Time Wages (6/18-622/23) | $18,201 |
| Employee Withholdings – Medical Insurance (6/18-6/22/23) | $9,304 |
| Employee Withholdings – Vision Insurance (6/18-6/22/23) | $232 |
| Employee Withholdings – Dental Insurance (6/18-6/22/23) | $2,046 |
| Employee Withholdings – Life, Accidental Death (6/18-6/22/23) | $2,378 |
| Employee Withholdings – 401k Contribution (6/18-6/22/23) | $4,618 |
| Employee Withholdings – Flex Spending Account (6/18-6/22/23) | $843 |
| Employee Garnishments and Child Support (6/18-6/22/23) | $423 |
| Federal Income Tax Withheld (6/18-6/22/23) | $28,905 |
| FICA Tax – Employer Contribution (6/18-6/22/23) | $21,339 |
| FICA Tax – Employee Contribution (6/18-6/22/23) | $21,339 |
| Oklahoma State Income Tax (6/18-6/22/23) | $549 |
| Federal Income Tax Withheld (5/21-6/3/23) | $87,034 |
| Employee Withholdings – 401k Contribution (5/21-6/3/23) | $21,687 |
| FICA Tax Employer Contribution (5/21-6/3/23) | $62,858 |
| FICA Tax Employee Contribution (5/21-6/3/23) | $62,858 |
| Employee Withholdings – 401k Contribution (6/4-6/17/23) | $12,929 |
| Federal Income Tax Withheld (6/4-6/17/23) | $80,934 |
| FICA Tax Employer Contribution (6/4-6/17/23) | $59,750 |
| FICA Tax Employee Contribution (6/4-6/17/23) | $59,750 |
| Oklahoma State Income Tax (6/4-6/17/23) | $1,538 |
| Employee Expense Reimbursement | $5,000 |
| Miscellaneous | $10,000 |
| Total | $776,956 |

[3] The amounts included are approximate amounts, and may fluctuate. In addition, for certain of the categories, the Debtor does not believe they owe any amounts prepetition. However, the Debtor includes these categories to the extent it is discovered that amounts are, in fact, due prepetition.

72.     While the Debtor expects that there will be no outstanding checks for Pre-Petition Obligations for Wages that have not yet cleared the Debtor's bank accounts, in an abundance of caution, the Debtor seeks authority through this Motion for any checks for Pre-Petition Obligations that have not yet cleared the Debtor's bank accounts to be honored post-petition.  In the event there are any outstanding checks, the Debtor estimates the amount of such checks will total less than $40,000.

73.     The Employees are paid bi-weekly, each approximately six (6) days in arrears. Bi-weekly payroll averages between $550,000 and $625,000.  The Debtor funds and disburses payroll payments internally.

74.     As of the Petition Date, the Debtor made deductions from the Employees' paychecks for payments on behalf of the Employees for various federal, state, and local income, FICA, and other taxes, as well as for garnishments, support payments and tax levies, savings programs, benefit plans, flexible savings accounts, insurance programs, credit unions, and other similar programs on account of which the Debtor deducts a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, the "Deductions").

75.     Because of the timing of the filing of the Case, the Employees have not been paid all their compensation earned through the Petition Date.  The Debtor estimates that as of the Petition Date, accrued but unpaid wages for the Employees is approximately $220,000.  In addition, the applicable Deductions may not have yet been taken. To the extent Deductions have been taken, however, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions. The Debtor estimates that, as of the Petition Date, they are holding Deductions already taken aggregating approximately $449,388 which the Debtor seeks to pay to third parties in accordance with their prepetition practice.

76.     The Debtor estimates that, as of the Petition Date, accrued but unpaid compensation, including the Deductions, totals approximately $776,956. The Debtor seeks authority to pay, continue, or otherwise honor their Prepetition Obligations in the ordinary course of their businesses. None of the amounts to be paid to the Employees for pre-petition wages will

exceed the $15,150.00 cap set forth in Bankruptcy Code § 507(a)(4).  The Debtor believes that the costs associated with paying such amounts are relatively minimal compared with the damage to the Debtor's estate that would follow if employee morale and patient care were harmed by the Debtor's failure to meet its payroll  obligations.

<u>Business Expense Reimbursement</u>

77.    The Debtor, in the ordinary course of its business, reimburses the Employees for certain business related expenses that the Employees incur.  These include expenses for supplies and other incidental expenses.  The monthly reimbursable expense is fairly small but it is essential to the continued operation of the Debtor's business that the Debtor be permitted to continue reimbursing the Employees for such business expenses.

78.    The Debtor requires that, to be reimbursed for business expenses, an Employee must submit expense reports, together with appropriate supporting documentation. The Debtor expects that the total amount of unreimbursed business expenses as of the Petition Date will be $3,000.00, but certainly will not exceed $5,000.00.

<u>PTO</u>

79.    As part of their overall compensation, Employees are entitled to receive a certain number of days of paid time off ("<u>PTO</u>").  PTO starts to accrue immediately upon employment. Upon giving at least seven days' notice, an Employee generally receives "cash out" payments for any accrued and unused PTO. An Employee who fails to give at least seven days' notice does not receive a "cash out" payment.

80.    The Debtor estimates that, as of the Petition Date, total accrued but unpaid PTO is approximately $775,000. By the Wage Motion, the Debtor is not seeking to pay such sums to the Employees but does seek authority for the Employees to use their accrued PTO in the ordinary course of business pursuant to the Debtor's policies and procedures regardless of the maximum amount provided for in §507(a)(4).

Health Benefits

81.     The Debtor offers various "base and buy up" plans with Blue Cross Blue Shield of Texas for medical insurance ("Medical Plan").  As of the Petition Date, approximately 250 Employees were participating in one of the medical insurance plans.  The Debtor pays approximately 90% of the premiums for those employees.  The cost per month to the Debtor for the Medical Plan is approximately $270,000.

82.     The Debtor offers dental insurance through Met Life ("Dental Plan").  The Debtor pays 90% of the premiums for those employees.  As of the Petition Date, approximately 250 Employees were participating in the Dental Plan.

83.     The Debtor offers vision insurance through Met Life (the "Vision Plan" and collectively with the Medical Plan and the Dental Plan, the "Health Benefits").  The Debtor pays 90% of the premiums for those employees.  As of the Petition Date, approximately 250 Employees were participating in the Vision Plan.  The cost per month to the Debtor for the Dental and Vision Plan is approximately $17,000.

84.     Only full-time and part-time Employees are eligible for the Health Benefits.

Other Benefits

85.     The Debtor provides Employees with a policy for life insurance and accidental death and dismemberment through Mutual of Omaha  (the "Life Plan") with an option for the employee to purchase an additional amount.  Only full-time and part-time Employees are eligible for the Life Plan.  The cost per month of the Life Plan is approximately $23,000 per month.

86.     The Debtor provides eligible Employees with an option to contribute to a flex spending account through Paychex.

87.     As required by statute, the Debtor maintains a comprehensive employer's indemnity policy in lieu of workers compensation insurance (the "Employer's Indemnity Insurance").  The Employer's Indemnity Insurance   is provided through Old Republic Union Insurance Company.  The annual cost of the Employer's Indemnity Insurance is approximately $28,340.

88.     The Debtor offers voluntary short-term, long-term, critical illness, and accident insurance through Mutual of Omaha. These programs are 100% Employee funded.

89.     Employees may also participate in a 401(k) plan. The Debtor has not matched any 401(k) contributions since January 1, 2015.

90.     Certain of the Employee Programs remained unpaid or unprovided for as of the Petition Date because certain obligations of the Debtor under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of the Case, but will not be required to be paid or provided in the ordinary course of the Debtor's business until a later date. The Debtor seeks authority to pay or provide, as they become due, all prepetition Employee Programs that have already accrued and that are described above.

91.     The Debtor also requests confirmation of its right to continue to perform its obligations with respect to these Employee Programs on a postpetition basis. The Employee Programs are an important component of the total compensation offered to the Employees, and are essential to the Debtor's efforts to maintain Employee morale and minimize attrition. The Debtor believes that the expenses associated with the Employee Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Employee Programs were discontinued. Notwithstanding the foregoing, the Debtor reserves the right to evaluate all Employee Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of the Case.

92.     With respect to the compensation and the Employee Programs described above, the Debtor contracts with several vendors to administer and deliver payments or other benefits to their Employees (the "Administrators").  In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtor for reimbursement of payments made.  For example, the Debtor, in the ordinary course of business, pays Hodges Mace, LLC for certain benefits administration services.

93.     In conjunction with the Debtor's payment of compensation and other benefits, the Debtor believes that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees.  I believe that the Administrators may terminate their services to the Debtor unless the Debtor pays the Administrators' prepetition claims for administrative services rendered.  A need to replace any one of the Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees.  I believe that the payment of claims owed to the Administrators is in the best interest of the Debtor's estate.

94.     Prior to the Petition Date, the Debtor may have paid certain of its Prepetition Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Obligations, the Debtor requests that the Court enter an order requiring the Debtor's banks to honor any such checks which are drawn on the Debtor's accounts, and authorizing the banks to rely on the representations of the Debtor as to which checks are subject to the Motion. To the extent that any such checks are refused payment, the Debtor additionally requests authority to issue replacement checks and to reimburse the Employees for any loss resulting from the dishonoring.

95.     The Debtor represents that: (a) it will not distribute any amounts over $15,150.00 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Wages or (ii) any other compensation due to an Employee; (b) will not make contributions to any employee benefit plan on account of unpaid prepetition amounts in excess of (i) the number of Employees covered by such plan multiplied by $15,150.00, less (ii) the aggregate amount of prepetition Wages and ordinary course bonus payments, plus the aggregate amount paid by the Debtor on behalf of such Employees to any other employee benefit plan, as provided under § 507(a)(5) of the Bankruptcy Code; and (c) it will not pay any amounts in excess of the estimated outstanding prepetition cap amounts for each category of prepetition claims identified in the chart above and

in the proposed interim order without further order from this Court, except to the extent required under state law.

96.    Finally, the Employees are absolutely necessary to the Debtor's continued operations.  The inability to provide competent patient services would adversely impact the Debtor and its ability to successfully reorganize and emerge from Chapter 11.

97.    Many Employees may live from paycheck to paycheck and rely exclusively on receiving their full compensation and/or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtor is not permitted to pay and/or honor the Wages and Employee Programs, and the expenses associated therewith, in the ordinary course of the Debtor's business. Moreover, the Debtor believes that if it is unable to honor accrued Wages and the Employee Programs described above, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. The Debtor believes that any uncertainty with regard to continuation of Wages and the Employee Programs will cause significant anxiety at precisely the time the Debtor needs it Employees to perform their jobs at peak efficiency.

98.    As stated above, the Employees are composed of health care workers and staff that ensure that WNJ is able to operate and provide patient services. Such Employees would be difficult, if not impossible to replace.

99.    If the Employees were to leave the Debtor's employment, the Debtor could be unable to provide patient services and lose valuable revenue generated by those services. Consequently, it is absolutely imperative that the Debtor's Employees remain satisfied with their employment, which means their Wages and Employment Programs must be maintained.

100.    I believe that satisfaction of the Wages and Employee Programs, as described herein, is necessary to maintain the Employees' morale during the case and to ensure continued, efficient operation in order to maximize value for all creditors.

**Claims Agent Application**

101.    By the Claims Agent Application, the Debtor seeks entry of an order (i) appointing Donlin, Recano & Company, Inc. ("DRC") as claims and noticing agent ("Claims and Noticing Agent") to Debtor in this Case effective as of the Petition Date; and (ii) granting related relief.

102.    In choosing DRC to act as the Claims and Noticing Agent, the Debtor obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, based on all engagement proposals obtained and reviewed, it appears that DRC's rates are competitive and reasonable given DRC's quality of services and expertise.

103.    Although the Debtor has not yet filed its schedules of assets and liabilities, it anticipates that there will be significantly more than 200 entities to be noticed.  Local Rule 2002-1(f) provides that "[i]n all cases with more than 200 creditors or parties in interest listed on the creditor matrix, unless the Court orders otherwise, the debtor shall file [a] motion [to retain a claims and noticing agent] on the first day of the case or within seven (7) days thereafter."  In view of the number of parties to notice and potential claimants, I believe that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of the Debtor's estate and its creditors.

104.    The services to be provided and the fees to be incurred by DRC are set forth in more detail in the Claims Agent Application.

**Utilities Motion**

105.    I believe that utility services—power, water, cable, internet, security and other similar utility services (collectively the "Utility Services")—are essential to the ability of the Debtor to sustain operations while its chapter 11 case is pending and, therefore, to the success of the Debtor's reorganization.  Any interruption of the Utility Services, even for a brief period, would severely disrupt the Debtor's business operations and would be extremely harmful to the Debtor's ability to provide patient care at WNJ. Accordingly, any interruption of the Utility Services will significantly impact the Debtor's revenues, profits, and ultimately its ability to successfully

conduct a sale of its assets. I believe it is therefore critical that all Utility Services continue to be provided to the Debtor on an uninterrupted basis.

106. In the normal course of its business, the Debtor obtains Utility Services provided by a number of entities (each a "Utility Company" and collectively, the "Utility Companies"). The Debtor pays the Utility Companies, on average, approximately $130,000 to $140,000 per month for services rendered. A list of the Utility Companies is attached to the Utilities Motion as Exhibit A. To the best of my knowledge, prior to the commencement of this Case, the Debtor was current with respect to undisputed invoices for Utility Services. Moreover, the Debtor expects that on the Petition Date, there will be no outstanding balances owed to the Utility Companies.

107. Based upon cash flow from operations and the services provided by AHS-Sherman, the Debtor expects to have ample liquidity to pay timely all postpetition obligations owed to the Utility Companies.

108. However, to provide adequate assurance to the Utility Companies as required under section 366(c) of the Bankruptcy Code, the Debtor proposes to deposit on account of each Utility Company listed on the Utilities List (as may be amended) an amount equal to the value of two (2) weeks of Utility Services provided by the Utility Company, based upon the Debtor's estimated average monthly bill as fully set forth in the Utilities Motion.

109. I believe that the adequate assurance proposed by the Debtor, together with the Debtor's ability to pay for postpetition Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies. The Debtor has a powerful incentive to stay current on its utility obligations because of its reliance on Utility Services for the operation of WNJ.

110. If the Motion is not approved, the Debtor could be forced to address requests by the Utility Companies in a disorganized manner during the critical first weeks of this case. Moreover, the Debtor could be blindsided by a Utility Company unilaterally deciding on or after the 30th day following the Petition Date that it is not adequately protected and subsequently discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of

Utility Services could potentially shut down operations and harm patient care. Consequently, I believe that any significant disruption of to the Utility Services would put this chapter 11 case in jeopardy.

**DIP Motion**

111.     The Debtor has determined that in order for the Debtor to continue operating during this Case, the Debtor will need cash until the closing of a sale of substantially all of the Debtor's assets. To obtain the use of the necessary funds, the Debtor has negotiated with the MPT Sherman (hereafter "DIP Lender") with respect to it providing the necessary funds.

112.     In anticipation of the filing of this Case, pursuant to that certain Senior Secured Prepetition and Superpriority Debtor in Possession Promissory Note (as it may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Note" and together with the other Loan Documents, as defined in the DIP Note, the "DIP Loan Documents"), a copy of which is attached to the DIP Motion as **Exhibit "A"**, the DIP Lender extended a credit to the Debtor consisting of a senior secured term loan in the aggregate principal amount of $375,000.00 ("Prepetition Loan") to cover the prepetition payroll costs of the Debtor through June 17, 2023 (exclusive of taxes and withholdings). This eve of bankruptcy funding was essential to permit the Debtor to smoothly transition its operations into bankruptcy and directly benefited the Debtor's Employees, and by extension, the Debtor's patients and other stakeholders by avoiding operational disruption.

113.     Further, as stated above, to help facilitate the transaction with AHS-Sherman and subject to Court approval, the DIP Lender agreed to provide a multi-draw term loan credit facility (the "DIP Credit Facility") under and in accordance with the DIP Note. Pursuant to the DIP Note, the DIP Credit Facility will consist of post-petition senior secured and superpriority loans (the "DIP Loans") in an aggregate principal amount not to exceed $1,000,000.00. The proposed DIP Loans will be used to: (1) repay in full the Prepetition Loan plus any accrued and unpaid interest thereon (collectively, the "Prepetition Obligations"); (2) pay fees and expenses related to the DIP Note and this Case; and (3) fund payroll taxes and employee withholdings for periods through

June 17, 2023. All payroll related expenses incurred after June 17, 2023 will be assumed by AHS-Sherman.

114.    Pursuant to the DIP Motion, the Debtor seek entry of an orders: (a) authorizing the Debtor to obtain postpetition financing in the form of the DIP Note, (b) authorizing the Debtor to use Cash Collateral (defined below) pursuant to sections 362 and 363, (c) schedule a final hearing, (d) modifying the automatic stay, and (e) granting related relief.

115.    The Debtor is in need of an immediate additional infusion of liquidity to satisfy payroll obligations and to pay for certain costs and expenses related to the Case.  I believe that access to the liquidity made available through the DIP Note is vital to the Debtor's ultimate goal of selling substantially all of its assets. Absent the liquidity provided under the DIP Note, the Debtor will be unable to achieve the sale of its assets, destroying potential value for the Debtor's stakeholders and adversely impacting the Debtor's employees, patients, and the broader community served by the hospital.

116.    Despite the efforts of the Debtor and its representatives, the Debtor has been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a) or (b); or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought in the DIP Motion.

117.    Due to its current financial condition, the Debtor has been unable to secure a working capital loan.  In an effort to secure a working capital loan, the Debtor's executives engaged in discussions with several lenders, including the lender who most recently provided a revolving credit facility under which Debtor was a co-borrower, that provide revolving credit facilities backed by a hospital's accounts receivable. These efforts were unsuccessful as no lender was willing to provide a working capital loan against the Debtor's receivables in light of the Debtor's financial condition, its outstanding obligations, and existing litigation.

118.    Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtor commenced arm's-length negotiations with the DIP Lender regarding the DIP Note.  Notwithstanding the fact that the DIP Lender was the only party willing to provide post-petition financing to the Debtor, the Debtor and the DIP Lender did meaningfully engage on the terms of the DIP Facility in good faith and at arms' length.  The DIP Lender was only willing to provide the DIP Note, if, among other things, it was granted: (1) an allowed superpriority administrative expense claim pursuant to Section 364(c)(1); (2) an automatically perfected, first priority security interest in all of the Debtor's assets (subject to any permitted, perfected prior liens); and (3) payment of the Prepetition Obligations.

119.    The DIP Note is the result of (i) the Debtor's reasonable and informed determination, in its business judgment, that the DIP Lender offered the most favorable terms available on which to obtain needed postpetition financing, and (ii) extended arm's-length, good faith negotiations between and among the Debtor and the DIP Lender, each of whom are sophisticated parties represented by counsel.

120.    I believe that the terms and conditions of the DIP Documents are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtor, its estate and its creditors.

121.    The proceeds under the DIP Note will be used only for purposes that are permissible under the Bankruptcy Code, no consideration is being provided to any party to the DIP Note other than as described herein, and the DIP Lender extended the DIP Note in reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Lender has agreed that it will consent to the Debtor's proposed use of Cash Collateral. The DIP Loans are subject to any prior properly perfected, non-avoidable liens.

122.    The Debtor cannot sustain operations and pay critical expenses if it cannot obtain postpetition funds by way of a debtor-in-possession loan.  In order to do so, the Debtor must obtain

financing from the DIP Lender, however, the only way to obtain such financing is to grant to the DIP Lender the protections provided in the DIP Note and as described above.

123.    The Debtor's ability to continue to operate WNJ pending a sale pursuant to section 363 of the Bankruptcy Code depends upon its ability to obtain the funds provided for by the DIP Note.  Without the proposed financing, the Debtor will not have sufficient funds to fund payroll expenses, which would jeopardize the successful sale of substantially all of the Debtor's assets and diminish recoveries for the Debtor's stakeholders.

124.    I believe it is essential that the Debtor maintains stability to facilitate the sale process and maximize the value of its assets.

### F.    CONCLUSION

125.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  June 23, 2023

_____
Michael Sarrao
Executive Vice President