UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                  .  Chapter 11 (Subchapter V)
IN RE:                            .
                                  .  Case No. 23-10787(JKS)
ALECTO HEALTHCARE SERVICES,       .
LLC,                              .
                                  .
                                  .  824 Market Street
                                  .  Wilmington, Delaware 19801
                     Debtor.      .
. . . . . . . . . . . . . . . . . Thursday, October 19, 2023
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:            Jeffrey R. Waxman, Esq.
                           Christopher Donnelly, Esq.
                           MORRIS JAMES, LLP
                           500 Delaware Avenue, Suite 1500
                           Wilmington, Delaware 19801

For the U.S. Trustee:      Linda Casey, Esq.
                           OFFICE OF THE U.S. TRUSTEE
                           844 King Street, Suite 2207
                           Wilmington, Delaware 19801

Subchapter V Trustee:      Jami Nimeroff, Esq.
                           BROWN MCGARRY NIMEROFF, LLC
                           919 North Market Street
                           Suite 420
                           Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:            Electronically Recorded
                           by Madeline Dungey, ECRO

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For the Official Committee
of Unsecured Creditors
of Sherman/Grayson
Hospital, LLC:                     Christopher M. Samis, Esq.
                                   POTTER, ANDERSON & CORROON, LLP
                                   1313 North Market Street
                                   6th Floor
                                   Wilmington, Delaware 19801

For the Reed Action
Judgment Creditors:                William D. Sullivan, Esq.
                                   SULLIVAN HAZELTINE ALLINSON, LLC
                                   919 North Market Street
                                   Suite 420
                                   Wilmington, Delaware 19801

For Medical Properties
Trust, Inc.:                       David M. Klauder, Esq.
                                   BIELLI & KLAUDER, LLC
                                   1204 North King Street
                                   Wilmington, Delaware 19801

For Sherman/Grayson
Hospital, LLC:                     Scott J. Leonhardt, Esq.
                                   THE ROSNER LAW GROUP, LLC
                                   824 Market Street, Suite 810
                                   Wilmington, Delaware 19801

APPEARANCES VIA ZOOM:

For the Debtor:          Brya M. Keilson, Esq.
                         MORRIS JAMES, LLP

For the U.S. Trustee:    John Schanne, Esq.
                         OFFICE OF THE U.S. TRUSTEE

For Sherman/Grayson
Hospital, LLC:           Max Casal, Esq.
                         Alan Friedman, Esq.
                         SHULMAN, BASTIAN, FRIEDMAN
                          & BUI, LLP

For Altera Digital
Health:                  Jeffrey Garfinkle, Esq.
                         BUCHALTER

(Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)


For Daniel T. McMurray,
as Patient Care
Ombudsman:                   Sally Veghte, Esq.
                             KLEHR HARRISON HARVEY
                              BRANZBURG, LLP

                             Mark Fishman, Esq.
                             NEUBERT PEPE & MONTEITH, PC

For Genesa Reimbursement
Group:                       Mark D. Olivere, Esq.
                             CHIPMAN, BROWN, CICERO
                              & COLE, LLP


For LHP Hospital Group:      Mark Minuti, Esq.
                             SAUL EWING, LLP


For the Pension Benefit
Guaranty Corporation:        Zoe Wadge, Esq.
                             PENSION BENEFIT GUARANTY
                              CORPORATION


For the Reed Action
Judgment Creditors:          Colten Fleu, Esq.
                             MOUNTAIN STATE JUSTICE


For the United States:       Stanton McManus, Esq.
                             Leah Lerman, Esq.
                             U.S. DEPARTMENT OF JUSTICE


Also Appearing:              Andrew Logan
                             DONLIN, RECANO & COMPANY, INC.

                             Jeff Demma
                             STRETTO

                             Faisal Gill, Interested Party on
                              behalf of AHS Sherman, LLC

                             Jonathan Burket, Interested Party
                              on behalf of AHS Sherman, LLC

                             Taylor Harrison
                             DEBTWIRE

INDEX

|  | PAGE |
|---|---|
| STATUS CONFERENCE RE:  SHERMAN/GRAYSON CASE | 6 |
| RESOLVED MATTERS (RETENTION APPLICATIONS) | 23 |
| MOTION OF THE DEBTOR FOR AN ORDER (I) SCHEDULING A HEARING ON PLAN CONFIRMATION AND DEADLINES RELATED THERETO; AND (II) APPROVING THE SOLICITATION, NOTICE, AND TABULATION PROCEDURES AND THE FORMS RELATED THERETO | 24 |

(Proceedings commence at 4:00 p.m.)

(Call to order of the Court)

**(No Recording Microphones at Counsel Table and Lectern)**

THE COURT:  Please be seated.

This is Judge Stickles.  We're on the record in Alecto Healthcare Services, Case Number 23-10787.

MR. WAXMAN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. WAXMAN:  May it please the Court, Jeff Waxman of Morris James on behalf of Alecto Healthcare, the debtor.

As Your Honor is aware, this is the time set for the omnibus hearing in the Alecto bankruptcy case, but obviously, Your Honor scheduled a status conference in connection with the Sherman/Grayson case for the same time.

I'm not sure which case Your Honor would like to address first.

THE COURT:  I was going to address Alecto first, but I guess -- Sherman/Grayson, I don't have anything pending in front of me, so perhaps I should hear from Sherman/Grayson in case anybody wants to leave --

MR. WAXMAN:  Let me --

THE COURT:  -- unless someone --

MR. WAXMAN:  Let me --

THE COURT:  -- here objects.

MR. WAXMAN:  That makes sense, Your Honor.  I'm

happy to turn over the podium, I guess to Mr. Samis.

THE COURT:  Okay.

MR. WAXMAN:  I believe it was their request for a conference.

THE COURT:  Good afternoon, Mr. Samis.

MR. SAMIS:  Good afternoon, Your Honor.

Your Honor, for the record, Chris Samis from Potter, Anderson & Corroon, here today for the committee in the Sherman case -- or Sherman cases, I should say.

Your Honor, we asked for this status conference just to address an issue that has arisen in connection with the -- kind of the global context of the case.

THE COURT:  Okay.

MR. WAXMAN:  If Your Honor recalls, there was a management agreement, an amended management agreement that Your Honor approved, and there's a provision of that amended management agreement that requires the purchaser to be funding the administrative costs of the estate.  Your Honor recalls this was kind of a non-traditionally funded case from that perspective.

And we also have an interim compensation order that's been entered in this case.

We also have now a -- there's no order entered yet, but we hope that we're close to a global settlement of the case.  Mr. Waxman and I are still discussing that.  We -- I'm

hoping that, ultimately, we will reach resolution on that, but that motion now is also pending as we continue our discussion.

THE COURT:  Oh, when was that filed?

MR. SAMIS:  It was -- I believe it was filed earlier in the week.

MR. WAXMAN:  (Not identified) Tuesday.

MR. SAMIS:  Tuesday?  Yes.

THE COURT:  Okay.

MR. SAMIS:  So --

THE COURT:  Yesterday -- oh, Tuesday.  Sorry.

MR. SAMIS:  And that motion also contains a provision, Your Honor -- or that settlement agreement contains a provision that would require the purchaser to basically fund through the dismissal of the case --

THE COURT:  Uh-huh.

MR. SAMIS:  -- the purchaser is a party to that settlement agreement.  With all --

THE COURT:  The purchaser is a party?

MR. SAMIS:  Is a party, correct.

So, Your Honor, with all of that said, CNOs are being filed and the purchaser is not funding (indiscernible)

But also, we now see admin claims rolling in from certain parties; I think there are at least two pending admin claim motions that are on the docket.  And I think the

purchaser, to be fair, is in discussions with all of those parties.

And I want to be clear.  I'm not here today suggesting any drastic action.  I understand that the purchaser may be choosing, for example, to fund patient care obligations first.  The committee understands that and we want to see those obligations paid.  We want to see the sale close.  We want to see, you know, this hospital function and we want to see everyone safe.

However, we also want to see the purchaser live up to its obligations.  And to date, the information has been slow rolling out of them.  They have made certain offers, but, quite frankly, Your Honor, I'm uncomfortable with those offers because they are not -- they're covering certain professionals and not others.  I don't want to see a situation where we're setting ourselves up for a disgorgement motion later.

THE COURT:  Uh-huh.

MR. SAMIS:  I don't want to see a situation where the ombudsman isn't paid.

So, Your Honor, what I would ask for today -- I'm -- we let the purchaser know that this status conference was occurring, we told them even after they made their offer that we were going to proceed because we were uncomfortable with the fact that it only addressed our firm.  And I don't know

if they have chosen to appear or not.

So I'll tell you what we're going to ask for today, Your Honor. We're going to ask Your Honor to enter an order to show cause on the basis of the previously entered orders to have them appear and put together a payment plan to -- that would satisfy the obligations that they've incurred under the agreements that this Court has approved.

So, in the alternative, if Your Honor is uncomfortable doing that, since it's a status -- the context is a status conference, we'd ask that you set a further status conference where they're directed to appear and they address these issues.

THE COURT: Okay. Thank you.

Let me ask: Has -- are U.S. Trustee fees paid?

MS. CASEY: Your Honor, Linda Casey on behalf of the U.S. -- the United States Trustee in the Alecto bankruptcy case, which was a Sub V case, and fees aren't required to be paid.

THE COURT: Oh --

MS. CASEY: I don't know if John Schanne is --

THE COURT: I'm sorry.

MS. CASEY: -- is appearing virtually, so I don't know whether, in the --

THE COURT: I forget there were separate trustees. My apologies.

MS. CASEY: That's a separate case. I see he has -- although, quite frankly, that's also in the analysts' functions, but unless John knows ...

MR. SCHANNE: Your Honor, briefly, John Schanne on behalf of the UST.

I have not heard from my analyst that the fees --

THE COURT: Okay.

MR. SCHANNE: -- have not been paid, but that doesn't mean they have been. I can ask that affirmative question. But I cannot speak on that further than to say I haven't heard anything at this point.

THE COURT: Okay. Thank you, Mr. Schanne.

Let me ask.

MR. SCHANNE: Thank you, Your Honor.

THE COURT: Is there anyone on the line from the purchaser who would like to be heard?

MR. GILL: Yes, Your Honor. Good afternoon. My name is Faisal Gill, I'm Chief Legal Officer for --

THE COURT: I --

MR. GILL: -- American Health --

THE COURT: I'm sorry, sir. Could you start over? I -- you're breaking up.

MR. GILL: Good morning, Your Honor. My name is Faisal Gill, I am Chief Legal Officer for American Healthcare Systems.

MR. BURKET:  Jonathan Burket, as well, for the -- American Healthcare Systems.

THE COURT:  Okay.  Mr. Gill, would you like to respond?

MR. GILL:  Yes, Your Honor.

Your Honor, we are -- we have talked with the creditors' committee, we have talked with their professionals.  We are in the middle of preparing a payment plan.  We will live up to all of our obligations.

Our number one goal when we took over was to stabilize the hospital patient care.  There were certain things that were there that we did not know and we wanted to make sure that we took care of that first, and that has been our -- that has been our number one goal, is to make sure we keep the hospital opening and fully functioning.  We believe that that is in the best interests of all parties here, including the creditors' committee and including the professionals here, and we are working on that.

But we've talked to -- you know, my colleague Jonathan Burket talked to several folks yesterday.  We plan on working out a payment plan with everybody and we plan on, you know, paying the professionals.  So that is absolutely our goal, that is absolutely what we're doing.

Since we have taken over, we have spent more than $2 million in operations of the hospital, just to keep the

hospital going and to pay its -- you know, its operational costs, and you know, we will continue to do that, to make sure the hospital (indiscernible) patient care (indiscernible)

In short, we do plan to pay everybody, but I don't want the Court to think that we don't take our obligations seriously or that we're not taking any obligation or that we're taking any money out from the hospital.  That is certainly not the case.

THE COURT:  Well, I'm concerned here that, you know, the purchaser did agree to fund all the debtor's operations and the administrative expenses, including the professional fees, the U.S. Trustee fees, so -- and I'm also concerned, given the timing of this case -- I'm not sure when your motion is scheduled.

MR. SAMIS:  It was a 9019, Your Honor, we filed it -- so it's probably, you know, at this point, about 18 days. I don't remember (indiscernible) but it's at least that much time.

It's -- the thing that concerns us more, Your Honor, to be honest with you, is the impending closing.  And I don't know where the debtors are on the regulatory approvals that are necessary, but that was originally scheduled at the end of the month.  And so, you know, if that's going to happen, what we don't want is the purchaser,

you know, welching on the settlement agreement thereafter --

THE COURT: Right.

MR. SAMIS: -- and then vanishing into the sunset --

THE COURT: Right.

MR. SAMIS: -- and us being left suing them in State Court. That is just not going to be acceptable for, I think, administrative (indiscernible)

THE COURT: When is the settlement scheduled, Mr. Gill? And that -- Mr. Gill, and do you have Delaware counsel?

(Participants confer)

MR. GILL: We should, Your Honor.

MR. SAMIS: If -- I am not aware that they have Delaware counsel, Your Honor, or counsel at all, to be -- other than the (indiscernible)

(Participants confer)

MR. FRIEDMAN: Your Honor, this is Alan Friedman. Maybe I can help a little bit.

The settlement motion is set, I believe, for -- on the next omnibus hearing.

THE COURT: I don't know when --

MR. FRIEDMAN: I didn't --

THE COURT: -- that is.

MR. FRIEDMAN: It's either November 7th or November

8th.  I don't have a date in front of me.

MR. SAMIS:  Your Honor?  Sorry, Mr. Friedman.  It's November 7th at 11 a.m.

THE COURT:  Okay.

MR. FRIEDMAN:  Okay.  That's when the settlement motion is going to take place.

And I just wanted to advice the Court that we -- I represent the debtor, by the way.

THE COURT:  I under -- yeah.

MR. FRIEDMAN:  We've been in communication with the buyers, as well, and we sent them a letter a couple of days ago, advising them, you know, of sort of a list of the things that need to be accomplished as to closing.  And one of those items -- or a couple of those items relate to the payment of outstanding admins and other fees.

And just so everybody is clear and so no one is surprised, our goal is to have this close quickly, maybe hopefully by October 31.  But the debtor is not going to be in a position to allow a closing unless there have been, you know, from our perspective, ironclad arrangements made to have all these things paid, you know, at -- as Mr. Samis said, we don't have an interest in having this close and find ourselves two or three months later still pursuing this.

So, Your Honor, the debtor is on top of this as best we can be, and we are not going to allow this to close

and vanish into the dead of -- darkness of night with these issues not resolved.

THE COURT:  Is there any possibility this is going to close before December 31?

MR. FRIEDMAN:  Well, the game -- again, the original game plan is that it close by October 31.  I can't speak specifically to the various licensing issues that are still in process.  So I think the goal is to close as quickly as possible, but there are still a host of issues that have to get wrapped up, again, not the least of which are addressing these outstanding fees and potentially other expenses that haven't been paid that we may not have visibility on.

MR. SAMIS:  And Your Honor, the -- Chris Samis again, for the record, from Potter Anderson.

I just want to also be clear we are aligned with Mr. Friedman on that.  We will be seeking to compel enforcement of the previously entered orders and enjoining the closing of the sale, if we have to.

THE COURT:  Okay.  I am looking at scheduling a further hearing on this.

MR. SAMIS:  Uh-huh.

THE COURT:  But I'm looking at when to schedule --

MR. SAMIS:  Your Honor, that --

THE COURT:  -- because --

MR. SAMIS:  From the committee's perspective, we don't think it should be that hard for the purchaser to put a plan together and we'd like to see something happen next week, if Your Honor has availability.  And we have a date-certain as to when payments are going to (indiscernible)

MR. GILL:  Your Honor, Faisal Gill for the purchaser.

We are in the middle of putting a plan together and we think we have a plan together by -- certainly by Monday and with a date-certain that we can present.

(Pause in proceedings)

THE COURT:  And would the parties be in a position to meet on Tuesday?

MR. SAMIS:  That works for the committee, Your Honor.

THE COURT:  I'm trying to look at --

MR. GILL:  Your Honor --

THE COURT:  -- what time.  Pardon?  So --

MR. GILL:  Your Honor, I would not be able to meet on Tuesday.  I have a hearing in Cincinnati in Federal Court -- in Appellate Court there.

(Pause in proceedings)

THE COURT:  I'm going to check my schedule, but i think it's going to be Wednesday at four o'clock, Wednesday the 25th at four o'clock.

MR. SAMIS:  Works for the committee, Your Honor.

THE COURT:  We'll have to take a quick recess for me to double-check, but I think that's what we're looking at.

I guess my question is:  At that juncture, do you anticipate, Mr. Gill, that you'll be able to submit a form of order to the Court setting a path forward?

MR. GILL:  Yes, Your Honor.

THE COURT:  That you're work with Mr. Samis and Mr. Friedman, I guess?

MR. GILL:  Yes, Your Honor, we will.

THE COURT:  Okay.

MR. SAMIS:  And Your Honor, you know, to the extent that Mr. Gill doesn't have counsel right now, we will work cooperatively -- collaboratively with him to submit something that the Court can sign (indiscernible)

THE COURT:  Okay.  And it may be stipulated.

Mr. Garfinkle, I -- my apologies.

MR. GARFINKLE:  Yes, Your Honor.  Jeff Garfinkle for Altera Digital Health.

Your Honor, I'm going to make a suggestion.  This debtor has been in bankruptcy, on my calculation, 118 days.  My client provides the backbone IT system.  It's now been 118 days and my client has not received one post-bankruptcy payment from the management company.

I would suggest, Your Honor, that Mr. Gill, as part

of his client, could forward a schedule showing all fo the unpaid admin claims that have accrued post-bankruptcy. We have no sense of what hasn't been paid. Seeing an inundation of other creditors filing administrative claim motions raises a big concern as to how deep this hole is, that they've been operating for 118 days post-bankruptcy.

MR. GILL: Your Honor, may I be heard on that?

THE COURT: Yes.

MR. GILL: Mr. Garfinkle, you and I have had several conversations and I think the ball is in your court. The last email that I had sent to you basically stated that we needed to meet because your system was not functioning properly, and you had responded back to me that you would talk internally and then get back to me, and then I never heard from you again.

So I do -- I don't think it's absolutely accurate that we have not paid. We do want to pay Altera, but there are certain things that are wrong with Altera that are directly causing the hospital not to get the funding that it needs in the revenue cycle. And I think they're directly going to all the issues that we have here. And that's why I've tried to communicate with you several times, to ask you if we can have your business folks and our business folks meet, and not just the business, the IT folks, and fix the problems with the system.

And again, I still would like to reiterate that we have that meeting sooner, rather than later, so we can fix the issues and get the money that's stuck in the revenue cycle for us.

THE COURT:  Okay.  Well, I have nothing in front of me that's ripe for adjudication, so I'm going to suggest that Mr. Garfinkle and Mr. Gill speak offline.

Mr. Gill, I'm also going to direct you to get Delaware counsel.  As a corporation, you need counsel in Delaware.  So I think that might help move matters along, as well.

But otherwise, we're going to reschedule this and I'm going to double-check, but it looks like Wednesday for four o'clock.

MR. SAMIS:  Very good, Your Honor.  We appreciate your time today.

And I also want to thank Your Honor for grating us this status conference.  I know you're busy and I --

THE COURT:  No, no.

MR. SAMIS:  -- (indiscernible)

THE COURT:  Certainly.  No problem.

But we do have a hard stop today because we're going to lose certain court functions at 5:30.

MR. SAMIS:  Understood.

THE COURT:  So, while I'm happy to hear from you

20

and I'm happy to continue this next week, but for now, I need to move on --

MR. SAMIS:  Very good.

THE COURT:  -- and because nothing is pending before me.

MR. SAMIS:  Of course.

THE COURT:  Okay?

MR. SAMIS:  Your Honor, we look forward to seeing you next week.

THE COURT:  All right.

MR. SAMIS:  Thank you very much.

THE COURT:  All right.  Thank you.

MR. SAMIS:  Your Honor, may I be excused?  I have (indiscernible)

THE COURT:  Certainly.

MR. SAMIS:  All right.  Appreciate it, Your Honor.

THE COURT:  Thank you.

Anyone who was here for the status conference can be -- is excused.

MR. FISHMAN:  Your Honor?  Pardon me, Your Honor?

THE COURT:  Yes.

MR. FISHMAN:  Just one other matter on Sherman Grayson.  My name is Mark Fishman and I represent the patient care ombudsman.

THE COURT:  I'm sorry.  I cannot --

MR. FISHMAN: (Indiscernible)

THE COURT: -- hear you, sir. I'm sorry. You're not getting picked up on the mic.

MR. FISHMAN: Oh, gosh.

THE COURT: Can you start again, please, or speak louder?

MR. FISHMAN: Can you hear me now, Your Honor?

THE COURT: Yes.

MR. FISHMAN: Good. Mark Fishman, representing the patient care ombudsman in Sherman/Grayson.

I want to make sure, since have many of the same concerns that Mr. Samis expressed, that I, on behalf of the ombudsman and his professional, be involved in that discussion also between him and Mr. Gill.

THE COURT: Well, Mr. Samis has left the room, but certainly -- oh --

MR. FISHMAN: Oh, he's left. He's gone.

THE COURT: I'm sorry.

MR. FISHMAN: He's gone.

THE COURT: I thought you left.

MR. SAMIS: I figured, Your Honor, when I saw Mr. Fishman begin to speak, I'd return, so ...

(Laughter)

MR. FISHMAN: Thank you.

THE COURT: Okay. So you'll make sure that Mr.

Fishman --

MR. SAMIS:  Of course.

THE COURT:  -- is included in your discussions.

I think that Mr. Samis made it clear earlier that he was not looking to have one professional paid --

MR. SAMIS:  Absolutely.

THE COURT:  -- over another.

MR. SAMIS:  That is -- I was more concerned with the initial offer, Your Honor, so --

MR. FISHMAN:  Yes.  Yes, he did --

MR. SAMIS:  -- (indiscernible) as well as the other professionals.

THE COURT:  Okay.

MR. FISHMAN:  He did make -- he did make that clear.

THE COURT:  Okay.  Great.  Thank you.

MR. SAMIS:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. WAXMAN:  Good afternoon again, Your Honor.

THE COURT:  Good afternoon.

MR. WAXMAN:  Jeff Waxman of Morris James on behalf of Alecto Healthcare, the Chapter 11 Debtor.

We are now moving forward with the Alecto portion of today's show, thank you.

I would like to introduce my colleague Christopher

Donnelly.  Last month, Chris was admitted to the Delaware Bar and, approximately 30 hours ago, Chris was admitted to the District Court for the District of Delaware.  This is Chris' first of what I assume will be many appearances before the Court.  And it is my pleasure to turn over the podium to Mr. Donnelly to walk through the agenda.

THE COURT:  Okay.  Thank you.

Welcome, Mr. Donnelly.  Congratulations on your admission to the Delaware Bar.

MR. DONNELLY:  Thank you, Your Honor.  Christopher Donnelly of Morris James for the Debtor Alecto Healthcare. Good afternoon, Your Honor, and may it please the Court, my name is Christopher Donnelly of Morris James for the Debtor Alecto Healthcare Services.

And there's a number of matters on the agenda for today's hearing, the first being the debtor's retention application for Stretto, Incorporated as balloting agent.  As Your Honor knows, the Court entered an order approving that application on Monday, October 16th, Docket Number 179.

And the second matter on the agenda today is also the debtor's retention application for Gould Consulting Services as forensic investigation --

THE COURT:  Uh-huh.

MR. DONNELLY:  -- consultant for the debtor, which the Court also approved, I believe it was yesterday, the

18th, Docket Number 184.

And unless Your Honor has any other questions, I will move onto the third item for this matter.

THE COURT:  I do not.  Thank you.

MR. DONNELLY:  Thank you, Your Honor.

And the third matter on the agenda today is the debtor's motion to approve, among other things, the solicitation procedures.  And my colleague Jeff Waxman will be handling that motion.

And additionally, before I turn the podium over, I would like to point out that the debtor did file a statement regarding the solicitation motion, specifically requesting clarification on certain solicitation and voting issues.

THE COURT:  I did see that.  Thank you for bringing it to my attention.

MR. DONNELLY:  Thank you, Your Honor.

And with that, I will turn the podium over.

THE COURT:  Mr. Waxman.

MR. WAXMAN:  Good afternoon again.

Your Honor, on September 14th, the debtor filed a Subchapter V plan at Docket 154.  And substantially contemporaneously with the filing of the plan, the debtor filed a solicitation motion, that seeks, among other things, certain deadlines, seeks approval for -- nobody has ever (indiscernible) too quiet, Your Honor, but I will try to be

closer to the microphone.

THE COURT:  Unfortunately, I think there's a fan above me; and, as a consequence, I have difficulty hearing all of you, so ...

(Court and court personnel confer)

THE COURT:  But anyway, I know you can speak loudly.

(Laughter)

THE COURT:  So use your outside voice.

MR. WAXMAN:  Yes, Your Honor.  Thank you.

On October 9th, the debtor filed a revised form of the plan, and that's at Docket 170.  The October 9th plan had significant changes from what had been originally filed.

Most importantly, I think to everybody involved in the case, the October 9th plan contained the complete report of Gould Consulting Services.

THE COURT:  Yes.

MR. WAXMAN:  And that is fairly extensive.  I don't know if Your Honor had a chance to read it.

THE COURT:  I did.

MR. WAXMAN:  By -- just by weight -- but it was pretty -- I think it was thorough, is the best way I can characterize it.

As revised, the October 9th plan contained unclassified claims and administrative expenses.

Additionally, the plan provided for four classes of claims and interests:

Priority non-tax claims, which were unimpaired;

Secured claims, which were unimpaired;

Unsecured claims, which were impaired;

And equity, which is unimpaired.

By that plan and by the solicitation motion, the debtor proposed to solicit acceptances from the unsecured claims class; that's Class 3. I want to put in a pin in that because we're going to get back to that in a minute.

Rather than starting with the voting and solicitation issues, I'm going to start with what may be the most controversial point of today, which is the deadlines.

When we had filed originally, we had a November 15th deadline that was kind of reset. And I know Your Honor has an extremely busy schedule. And accordingly, chambers provided us with an hour on November 29th at 10 a.m. I don't think, frankly, that's going to be good enough -- or not "good enough," but I don't think that's going to be an adequate --

THE COURT: Adequate.

MR. WAXMAN: -- amount of time. I think that's a good start, but I don't think that we're going to be able to get through a contested confirmation hearing. And to be certain, this is going to be a contested confirmation

hearing.

But if we start on November 29th, I -- the debtor worked backwards, in terms of setting deadlines, and I want to walk through those with Your Honor, premised upon a November 29th hearing.

Solicitation --

THE COURT:  Wait.

MR. WAXMAN:  -- and plan service --

THE COURT:  Hold on one second.  Do you have this written out anywhere or -- I can take notes.  I just wondered if you had an extra copy.

MR. WAXMAN:  If I may approach, Your Honor?

THE COURT:  Yeah, if you have an extra copy -- is that your only copy?

MR. WAXMAN:  I've got other copies.

THE COURT:  All right.

(Participants confer)

THE COURT:  I will -- just --

(Participants confer)

MR. WAXMAN:  If I could have a moment to remove the other portions that have my notes on it, I'm happy to provide you with the schedule.

THE COURT:  Just --

MR. WAXMAN:  I have provided it to the other parties.

THE COURT:  Just --

(Participants confer)

MR. WAXMAN:  If I may have just one moment, Your Honor.  And I apologize --

THE COURT:  Can we --

MR. WAXMAN:  -- for not having --

THE COURT:  Can you rip it and -- or however you're going to do it, and give it to the law clerk to get copied?  Sorry.  I just focus better if it's in front of me.

MR. WAXMAN:  May I approach?

THE COURT:  Certainly.  Actually, can you give it to them?  And they're going to go copy it.  And I'm going to ask that we just take two minutes to get it copied.

So we are not talking about the dates that were set?  I mean, I know we weren't talking about the dates set forth, but you weren't talking about the 15th, either.

(Participants confer)

THE COURT:  Okay.  That resolves an issue.

MS. NIMEROFF:  Because everything got --

THE COURT:  Okay.

MS. NIMEROFF:  Everything had to get pushed, so --

THE COURT:  Right.

MS. NIMEROFF:  -- that does (indiscernible)

THE COURT:  I just want to make -- I thought we had a 2002 issue, but you're telling me no.

MR. WAXMAN:  No.

THE COURT:  Okay.

MR. WAXMAN:  There's no 2002 issue, Your Honor.

THE COURT:  Okay.  If you could just wait one second.

MR. WAXMAN:  That's fine.  It's an excellent teaching moment to show this is why you bring multiple copies of your notes to the hearing.

(Pause in proceedings)

THE COURT:  Thank you.

(Court and court personnel confer)

MR. WAXMAN:  And again, Your Honor, I do just want to reiterate a copy of this schedule was sent to counsel for the U.S. Trustee, counsel for the Subchapter V Trustee, as well as to counsel for the Reed creditors prior to today's hearing.

THE COURT:  Okay.

MR. WAXMAN:  And again, this is premised upon the date that Your Honor's chambers gave us of November 29th.

So, starting off, the solicitation date would be within three business days after entry of the solicitation procedures order.

The deadline to file plan supplement would be November 7th.  Confirm -- and that, of course, is premised upon a November 14th date for a confirmation objection

deadline. And the reason for that, Your Honor, is because the U.S. Trustee usually requires seven days for plan supplements prior to the objection deadline.

THE COURT: The local rule requires seven days.

MR. WAXMAN: Okay. Thank you.

There is a voting deadline and a deadline to file voting tabulations affidavit that is penciled in there. Again, I want to put a pin in that for a moment.

And then there's the deadline for confirmation brief of November 17th;

And the deadline to file proposed confirmation order of November 22nd;

With a confirmation hearing to start November 29th.

So that gets to the solicitation issues, unless Your Honor would like to discuss the timing issues. And I know that the Reed creditors do want to discuss the timing issues.

THE COURT: Well, I'd like to discuss timing, too.

MR. WAXMAN: Okay.

THE COURT: I'm not so sure why this is -- why is the voting deadline is the 14th or 17th for a hearing on the 29th? I'm just --

MR. WAXMAN: Well, Your Honor, it kind of backed its way in. And the reason for that is the 22nd seems like a long period away. You actually have --

THE COURT:  Oh, because it's a holiday.

MR. WAXMAN:  -- from the 29th, you have Thursday and Friday, so that's the Wednesday immediately prior to Thanksgiving.

THE COURT:  And I'm also -- I want to check right now because I thought the local rule -- and I'm going from memory and I might be making this up.  But I thought the local rule for a plan solicitation put a limitation about that it had to be at least seven days prior to the voting date or the objection deadline.  But I thought there was a proviso that something couldn't be like more than ten days before the hearing or something.  And I might be making that up.  I --

MR. WAXMAN:  I don't know what (indiscernible) you're referencing, Your Honor, so I just don't know how to answer --

THE COURT:  Yeah, and I --

MR. WAXMAN:  -- that question.

THE COURT:  I'm embarrassed to say I don't have a copy of the local rules --

MR. WAXMAN:  That's okay.

THE COURT:  -- at my fingertips.  But I can always pull it up on line.  But I can hear from the parties on scheduling, too.

MR. WAXMAN:  That's fine, Your Honor.

Okay.  So I want to talk about the solicitation issues.  Maybe it's easier to talk about the voting issues --

THE COURT:  Yeah, I think --

MR. WAXMAN:  -- because --

THE COURT:  -- that's a gate-keeping issue.

MR. WAXMAN:  I think that's a -- I think that's a gate-keeping issue, too, because that will affect the ability to move certain dates farther.  And the short answer is I think the debtor is going to pivot, subject to Your Honor's thoughts.

The Reed creditors are going to object to confirmation, and they have approximately 29 point -- 29 and a quarter percent of the total votes.  Their claim is 3,275,000 and change out of approximately 11.5 million, and that includes governmental claims.

THE COURT:  Right.

MR. WAXMAN:  And that's not including claims that the debtor agrees with; that's just the total amount that's been filed in the case.  So they've got approximately 29 percent.

And as I'm sure Your Honor can appreciate from your experience, the chances of getting a hundred percent of voting is zero.  The change of the Government voting is zero.  So they basically have a third.

Rather than spending estate money having

solicitation of votes and having Stretto prepare a voting tabulation, a declaration, and then preparing to testify, I think it's probably easier if the debtor just presumes in this case that they are an impaired, non-consenting class, and proceeds moving forward in this case under Section 1191 solely on the basis that the plan does not discriminate unfairly and is fair and equitable as to each class of creditors.  In light of the position of the Reed creditors in this case, that seems to make the most sense.

Obviously, if Your Honor has concerns, we're happy to discuss them.  I have spoken with the -- about this with the Subchapter V Trustee.  I told the Reed creditors and the U.S. Trustee today by the same email that set out the schedule.  I don't know if any of them take a position with respect to it.  But in this case -- and I'm not saying this is a good idea in all cases.  But I think, in this case, making the assumption that they are impaired and non-consenting makes sense.

Does Your Honor have any questions?  If not --

THE COURT:  No.

MR. WAXMAN:  -- I'm happy to move on.

THE COURT:  No.  I want to hear what others have to say about this.

MR. WAXMAN:  So there is a second issue that I do want to address, and this was raised by a statement that was

filed earlier this week.  And I -- we put in -- the debtor put in the statement because it's something that -- and this is my fault.  I should have thought about this when we filed the solicitation motion, but I didn't.  That is a *mea culpa* because it's something that doesn't happen that often in bankruptcy.

We see class creditors, but they're usually WARN claims that happen, but you don't have a judgment beforehand, or they're WARN claims that happen in the case and there hasn't been a judgment.

THE COURT:  Right.

MR. WAXMAN:  In this case, you actually have a judgment and we have the names of all the people.  And the lengthy attachment that is the exhibit to the statement has the names of over 400 people.

And the debtor has concerns that we rely upon the class certification, the plaintiffs, the named plaintiffs, representatives, and not give notice to each of the underlying claimants, which would be an expensive proposition, Your Honor, to send each one of them a copy of the plan.  But subsequently -- and we don't give them an opportunity to be vote because their votes are being considered by the class representatives.

So the worst case scenario, Your Honor, is that, a year down the line, two years down the line, some future

period, one of those claimants says, well, the plan isn't effective as to me because you didn't give me notice and I didn't have an opportunity to vote. And the old maxim, as Your Honor well knows, the relief that you get in bankruptcy is only as good as the notice you provide.

We are prepared -- and we've spoken with Mr. Sullivan, who agrees -- to send a copy to the 5 representatives and to counsel, who would get it anyway under 2002. They would submit -- you know, they would be the representative, so we wouldn't need to serve out 400, 500, however many plaintiffs there are, but we don't want to do so unless we can rely upon the Court's imprimatur that that is acceptable in this case.

THE COURT: So you would send notice just to the five reps.

MR. WAXMAN: To the five rep -- to the five representative creditors, who were approved as representatives in the underlying --

THE COURT: In the litigation.

MR. WAXMAN: -- West Virginia Court. This was a certified class, Your Honor.

THE COURT: Let me ask: How does those five representatives generally communicate --

MR. WAXMAN: That is --

THE COURT: -- with the claimants?

MR. WAXMAN:  That is a question for Mr. Sullivan. And I'm not sure that he can answer as much as his co-counsel, but I'm certainly happy to let him --

THE COURT:  Because --

MR. WAXMAN:  -- (indiscernible)

THE COURT:  -- I'm going to tell you right now, and you probably all know this about me, I'm pretty rule-driven, and I'm not inclined to waive notice to creditors.  So I'd like to hear how the class representative communicates with him.

And you know, it also plays into the claim, proof of claim that was filed here, so I need to hear from everybody.

MR. WAXMAN:  Well --

THE COURT:  I'm not going to make any judgments until I hear from everybody.

MR. WAXMAN:  That's fine.

Again, Your Honor, we filed this statement so that we would not catch Your Honor flatfooted --

THE COURT:  And I --

MR. WAXMAN:  -- without an --

THE COURT:  -- appreciate that.

MR. WAXMAN:  -- opportunity to consider the issue because the debtor considered it and was troubled enough by it that we wanted to flag the issue in order to prevent that.

THE COURT:  Right.

MR. WAXMAN:  Before turning over the podium to any other party, including Mr. Sullivan, who may want to address Your Honor's question, I would just point out only the Reed creditors' counsel filed a proof of claim in this case on account of the judgment.  And there was an order granting class certification by the West Virginia District Court.  In all fairness, I have no idea if that class certification still works once that case is over, but there is a judgment for those representatives, so that they all have been deemed as a matter of judicial determination to be representative of the class.

THE COURT:  So does the -- excuse me.  Does the debtor take the position that the proof of claim that was filed is a class proof of claim?

MR. WAXMAN:  Your Honor, I don't think we have to take a position on that, I think the document speaks for itself.  And the proof of claim clearly and unambiguously states that there are serving a claim on account of the entire class.

THE COURT:  Okay.

MR. WAXMAN:  I'm not sure if that answered your question or sidestepped it or if it was responsive at all, but that is the position of the debtor.

THE COURT:  Okay.

MR. WAXMAN:  I don't know if Your Honor would like to hear from other people.  I think that is the end to my presentation at this point because I think the other issues kind of work backwards from there.

THE COURT:  Yeah, I think that's right.

So perhaps I could hear from others.

(Participants confer)

MR. SULLIVAN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. SULLIVAN:  Bill Sullivan of Sullivan Hazeltine Allinson on behalf of the Reed Action Judgment Creditors.

Your Honor, let me start with the last point, the voting issues.

THE COURT:  Yes.

MR. SULLIVAN:  I will say that the Reed action claim was scheduled as a single claim, it was filed as a single claim in a slightly increased amount.  Your Honor, I have certainly sought and gotten approval of class proofs of claim in bankruptcy.  But given the certification that existed in the judgment, we didn't believe that was required in this case.

And with respect to the conversations that I had with Mr. Waxman, there is a certification order.  It does provide that the five class representatives are acting both on their own behalf and on behalf of all of the others, so

there is a duty for them to act.

We do -- we did advise Mr. Waxman that we believed that they were the ones who should be served and not all of the individual class members. That's sort of defeating the purpose of the certification.

THE COURT: I guess part of the -- what I'm struggling with is I haven't seen anything -- the -- I didn't know it was a WARN claim until I looked at the schedules. So I don't know what the certification order says.

MR. SULLIVAN: Yeah. No, I (indiscernible)

THE COURT: And I'm not -- I don't mean -- this is why I'm asking a lot of questions. Okay?

MR. SULLIVAN: That's fine.

THE COURT: So the certification order allowed the five representatives to take action on behalf of the entire class.

MR. SULLIVAN: Well, that is my understanding, Your Honor. The certification order, the significance of it is that it allows the class to exist --

THE COURT: Right.

MR. SULLIVAN: -- and proceed as a unit, but it does -- that is the purpose of designating the five class members.

You know, I've looked through it. It doesn't have this precise language that would obviously make it completely

clear.  But in terms of the legal function of the class representatives, that is the -- that is the purpose.  There's no purpose --

THE COURT:  In a class action suit.

MR. SULLIVAN:  Yes.  But I don't believe that anything changes in pursuit of the judgment post-judgment. It's still the same group of -- you know, pursuing the same action.  It's just gone beyond.  And just like you have post-judgment discovery, this is post-judgment collection and this is considered part of a collection action at this point now.

THE COURT:  Okay.

MR. SULLIVAN:  So I don't believe that changes, Your Honor.

With respect to your questions about how do they function.  I mean, they --

THE COURT:  Yeah.

MR. SULLIVAN:  The class representatives function with the advice of counsel.  But I can't provide more nitty-gritty details about how that happens or how frequently or those sorts of things.  But certainly, it's the class representatives who have the authority on behalf of the class and they're advised by counsel.  Counsel has been involved with me in this case, the stay is involved.

THE COURT:  So counsel for the class --

MR. SULLIVAN:  Yes.

THE COURT: -- in this bankruptcy doesn't oppose service on the five reps, solely on the five representatives.

MR. SULLIVAN: That's correct, Your Honor. That's our preference, that we serve solely the five reps.

THE COURT: Okay. Why isn't this a case -- or not "why." You know, oftentimes, counsel, when it is a class, will communicate with the debtors and enter into a stipulation with respect to the claim, the filing of a class claim, et cetera. Is there a reason the parties here haven't conferred and -- as to an approach or is this the discussion --

MR. SULLIVAN: It's just the --

THE COURT: -- that you have --

MR. SULLIVAN: It's just the timing of it.

THE COURT: Okay.

MR. SULLIVAN: It was raised, you know, by Mr. Waxman with me, I know he tried to raise it last week. I wasn't able to speak with --

THE COURT: No, I --

MR. SULLIVAN: -- to my folks until Tuesday.

THE COURT: Okay. I was just curious.

MR. SULLIVAN: Yes. It's just a timing issue.

MR. WAXMAN: Your Honor, I would also note that this is a little unusual because, again, there's already an order that's been entered, rather than an ongoing cause of

action --

THE COURT: Right.

MR. WAXMAN: -- or an action that has only been filed in the bankruptcy, so we're at a little different stage, in terms of ripeness of the class --

THE COURT: Uh-huh.

MR. WAXMAN: -- than what is normally seen in bankruptcy.

I would also just point out, Your Honor -- and I understand your concern with -- and your due process concerns completely, having appeared before Your Honor. I would also point out that this seems to make sense and balance the needs of the case versus the needs of the creditors.

If you had a case like Takata, where you possibly had 200,000 creditors -- 200 million creditors, I'm not sure that you could handle this in the same way, where the creditors, you know, are so large you might just do a public notice. In this case, I think this makes sense, given that you have counsel that's already been employed and has taken this to a judgment.

THE COURT: Okay. You can continue, Mr. Sullivan.

MR. SULLIVAN: Your Honor, with your permission then, I would like to address the schedule.

THE COURT: Yes, please.

MR. SULLIVAN: Okay. So, Your Honor, I guess, as a

prelude, the -- we filed our objection to this last Monday, which happened to be Columbus Day.  Of course, everybody agonized over whether we had to file it Monday or Tuesday, but we filed it on Monday, several hours later.  That's when the plan was filed and that's when the Gould report --

THE COURT:  Right.

MR. SULLIVAN:  -- was attached.  So it was the amended plan and the Gould report, which we saw Tuesday morning.

And then the other thing that has happened recently in the case, Your Honor, is that, on Tuesday of this week, two days ago, the 341 meeting was concluded.

THE COURT:  Oh, okay.

MR. SULLIVAN:  So there was a half-hour continuation and it was concluded and wrapped up.

THE COURT:  That was on the 17th.  Okay.

MR. SULLIVAN:  Yes.

So, Your Honor, just briefly, with respect to the amended plan, we see multiple problems with it:

In particular, it grants releases to the officers and managers for payment of $25,000.

The debtor retains all causes of action and has indicated that the independent director does not see any causes of action to bring.

It limits available cash flow to three years.

The members retain their membership interests.

But this is not the time for that.  I just wanted to sort of get to a prelude, and that is that, you know, all of this process really starts with the filing of the amended plan and the Gould report, which we've had for nine or ten days.

THE COURT:  Right.

MR. SULLIVAN:  So we've given them their time.  But this schedule does not give us our time to perform an analysis with sufficient detail.  There's going to be some documentation at least to be reviewed, but there's a lot of analysis that has to happen, as well, before an objection can be filed and framed in the way that the Court would expect.

So, Your Honor, let me just cut to the chase on the numbers here.  I recognize that this is a Subchapter V case. If we weren't talking about trying to plan around the holidays, I would say that the numbers that -- or the dates that Jeff has provided -- I'm sorry -- the dates that the debtor has provided --

THE COURT:  Understood.

MR. SULLIVAN:  -- need to be extended by 30 days. But nobody wants confirmation on December 29th, and neither do I and I'm not going to ask for that.

The driving force of this is the sequence of events that has to happen, which is the analysis, some discovery,

perhaps a deposition or two, and then preparing the objection. It can't be done on this schedule. And there isn't an operational reason, from the debtor's side, that it needs to be done that quickly.

There's not a committee on this side, there's not an FA on this side, there isn't estate expense burning while we're undertaking that effort at this point. So the typical argument about the administrative burden doesn't really hit in the same way in this case.

Other than the Sherman/Grayson Hospital, which is its own entity, this debtor doesn't have operations. It has a management contract that it continues to fulfill and will continue to fulfill for multiple years. But there isn't this sort of cost of operations either that might drive a need for expediency.

So, Your Honor, what we would ask for is not 30 days, but something along the line of 21 days. We believe it would be appropriate to have an objection deadline no earlier than December 5th, and then work out a confirmation date beyond that. If that doesn't work for the schedule, then, Your Honor, I think we need to schedule it in January.

I -- there's -- and again, I'm leaning to the former because, if that proves not to be enough time, then I'll come back and ask Your Honor and say here's all the things that we've done and we're not there, but I don't want

to prejudge that.

But in terms of preparing a confirmation objection by November 14, Your Honor, that (indiscernible) does not seem feasible based on where we are, and we feel like we've been patient to get to this stage.

THE COURT:  Thank you.

No, but I -- one question I did ask that -- and I'm jumping back to the voting issue and if voting was through five representatives.  How -- do you know how your representatives generally communicate with the class body or do -- or is it a situation where they have carte blanc to do whatever they want?

MR. SULLIVAN:  Your Honor, I guess I'm hindered a little bit because I'm not a class action lawyer, so I don't know the general --

THE COURT:  Right.

MR. SULLIVAN:  -- operations.  So all -- I only worked with Mr. Waxman on what we anticipated.

THE COURT:  Okay.

MR. SULLIVAN:  But I don't know the answer to that.

THE COURT:  Okay.  All right.  Thank you.

MR. SULLIVAN:  So the only other thing that I need to raise -- and I did raise this with Mr. Waxman yesterday -- and that is that we believe that this debtor has a Subchapter V eligibility issue.  Based on where things stand now, the

debtor had between eight and $11 million in liquidated and non-contingent debt as of the petition date.

It's a little bit unusual because the driving factor in this analysis is a large claim by LHP Systems. On the schedules, it was listed as contingent, disputed, and unliquidated. They filed it in the amount of $3.78 million. There has been followup by us or by the Reed creditors, both with counsel to LHP and at the continued 341 meeting with Mr. Sarrao to sort of get the bonafides of the claim.

There is a contingent component, but the number that has been asserted is the actual component, as we understand it. And therefore, that number, combined with the other creditors' claims, puts it somewhere around 8 million and up to 11 million depending on how the PBGC claims and the government claims shake out. Now I'm including the large piece of litigation with the Government, which I'm not counting at all. So, Your Honor, we do expect to be seeking to address that promptly.

And I had mentioned -- so -- and so, from our standpoint, to the extent that that impacts the way the Court views the solicitation process or the way the debtor views the solicitation process, that's why I'm bringing it up. I -- as I said, I talked to Mr. Waxman yesterday and told him I was going to address it with the Court today, and we expect to be filing something promptly.

So, unless Your Honor has any questions, I'll let --

THE COURT:  Yeah, let me hear from others.

MS. CASEY:  Good afternoon --

THE COURT:  Ms. Casey.

MS. CASEY:  -- again, Your Honor.  May it please the Court, Linda Casey on behalf of the United States Trustee.

We didn't file an objection to the solicitation motion, but we do have some comments with the way things have played out.  And some of my comments have changed, having heard the most recent statements.

So I'd like to start with the 341 meeting.  We did hold the 341 meeting at the beginning of the case, and it was continued.  The U.S. Trustee had requested that all insider transactions in the past year be updated because we noticed that affiliates were not included in that.  So that was filed, I believe, sometime last week, and we held the 341 last week.

(Participants confer)

MS. CASEY:  Tuesday.  My days are (indiscernible)

THE COURT:  It was this Tuesday, right?

MS. CASEY:  This past Tuesday.

UNIDENTIFIED:  Correct.

UNIDENTIFIED:  Two days ago.

MS. CASEY:  Yeah.

THE COURT:  Okay.  All right.

MS. CASEY:  And the deadline to object to Sub V classification is 30 days after --

THE COURT:  Right.

MS. CASEY:  -- (indiscernible) and I did promptly file (indiscernible) and I think it is prob -- I was going to discuss the schedule anyway, but I do think it is problematic to have a confirmation objection deadline before we even know if this should be a Sub V case or not a Sub V case.

So I think the suggestion that it be kicked off, not only for discovery, but also to see if there is, in fact, a basis for objecting to the classification as Sub V -- my office may take a look at this and take a position, I don't know.  But we are -- we already have one creditor stating that they're going to look into that.

So I -- you know, and I echo the concern -- the lack of concern, you know.  You don't have quarterly fees running.  You know, the debtor will have professional fees, but not the same as the -- I think on this side of the table over the next several days.  So that's -- I think I support kicking it off maybe even into January, if that's what it takes to make sure that we get past the thirty-day objection deadline for the Sub V classification.

I did have some nitpicks.  I didn't think there was

a need to wait to file the confirmation order, which should be a fairly easy document until a week before the hearing, especially with the holidays intervening in that week.  But those are sort of nitpicky compared to the --

THE COURT:  Overarching --

MS. CASEY:  -- bigger issue.

THE COURT:  -- issue.  Uh-huh.

MS. CASEY:  The issue on the presumed rejection.  I had just heard about this request today, so I haven't had a chance to talk to my client about it.  I do know the first case I was involved with where the Court invited a party to presume the class would reject was MCI WorldCom many years ago, so I do know it has happened.  Whether my client takes a position on it, I don't know.

However, with one thing, not soliciting is not the same as not serving.  So I would object to any kind of procedures where they say, because we're not soliciting the unsecured creditors, we don't have to serve them with the plan.

And then, finally, the class vote issue.  I'm going -- I'm not going to be very comfortable here either.  When we received the information -- the request to figure out what to do last week and I spoke with my client, our position was we're not taking a position until we see the filings.  And then, when the filing came in and all it said was, Your

Honor, there's an issue, we took the same position, and I think it sort of echos what we were saying.  We don't enough information to take a position as to what the appropriate thing is, so the United States Trustee is not taking a position on that today.

Unless Your Honor has any questions of me ...

THE COURT:  Hold on one second because I want to make sure I understand your position, Ms. Casey.

MS. CASEY:  I'm sorry?

THE COURT:  No, no, no.

MS. CASEY:  Okay.

THE COURT:  So is it the United States Trustee's position that -- and I -- and this is my word, obviously no one else's word -- but that essentially there should be a standstill of any solicitation approval process until the eligibility issue is resolved?

MS. CASEY:  Again, I didn't speak with my client. But in general, that is our position because it's usually early in the case.

THE COURT:  Right.

MS. CASEY:  I didn't ask him whether the facts were changed here.  But especially with parties indicating that there might be a significant issue with Subchapter V eligibility, I don't think it makes sense for a small debtor to expend the money in serving a plan if they're then found

to -- that a Sub V plan doesn't work.  And this is a -- this is a plan that takes advantage of Sub V.

THE COURT:  Absolutely.

MS. CASEY:  You know --

THE COURT:  And --

MS. CASEY:  -- and so it wouldn't be confirmable (indiscernible)

THE COURT:  Right.  And I don't say that in a negative way.

MS. CASEY:  Right.

THE COURT:  I just mean, yes, the three-year payout, et cetera, holding equity.  Understood, yes.

MS. CASEY:  So I do think, just from a judicial economy and from a financial economy, let's not spend the money on soliciting a plan if there is an issue as to Sub V eligibility at this time.

THE COURT:  Okay.  And the deadline to challenge Sub V eligibility would be --

MS. CASEY:  Thirty days --

THE COURT:  -- November 16th?

MS. CASEY:  -- after Tuesday.

THE COURT:  Yeah, I think it's like November 16th, so ...

Okay.  Let me ask that -- your comments are very helpful.  Thank you.

Would the Subchapter V Trustee like to be heard?

MS. NIMEROFF:  Thank you, Your Honor.  Good afternoon.  Jami Nimeroff, Subchapter V Trustee.

Your Honor, I filed a reservation of rights as to the solicitation.  That also was a bit of a timing thing because the amended plan hadn't yet been filed and there were many, many (indiscernible) that the debtor was intending, in terms of lit -- treatment of litigation, so ...

But you know, I -- hearing sort of all the comments and understanding that there's now a lot of work product that has been described in the plan and attached, it, to me, is not an unreasonable ask that the creditors be given an opportunity to take some discovery if they want or at least to have an opportunity to object -- to digest it before deciding about filing objections.

You know, I -- the goal -- and my primary responsibility in this case is to facilitate a consensual plan.  From the discussions with folks here, I'm sure you wouldn't be surprised to know that I have not felt bullish about achieving that in this case.  But I certainly never am wont to give -- you know, to give up.

Having a little more time to allow at least Reed Action Judgment Creditors to take some discovery and to formulate perhaps an ask of the debtor to get to a consensual, you know, situation that could be helpful, I

would counter that by saying, if the adamant on going forward (indiscernible) confirmation, you know, that's -- I've been in -- I've been in cases where that has happened, I've been in a case with Your Honor where that has happened. I've had at least one judge say to me that they absolutely believe there's no requirement, in reading the statute, to solicit at all.  I -- my experience with the judges here, and Your Honor as well, is it's not an absolute, it's nothing of that sort. It's sort of case by case, depends on the situation.

I did suggest to Mr. Waxman that, if he is -- firmly believes that non-consensual -- that a consensual confirmation is not achievable, then perhaps he would consider going that route, to save expense and whatnot.

So I don't think Mr. Sullivan's ask is unreasonable.  Beyond that, I don't have -- I don't take a particular position on, you know, sometime in December versus January, anything of that sort.

Now that -- you know, I was apprised that there is a view that there's an eligibility issue, you know, after the 341 was concluded.  I generally do not get involved in those, Your Honor.  That's -- my experience is that's usually -- it's either brought by the United States Trustee or by an individual creditor.  So I don't -- I'm not really taking any formal position with regard to that.

But certainly, if that's going to have to be

resolved, it makes sense that that is sooner, rather than later.

THE COURT:  Right.

MS. NIMEROFF:  Does Your Honor have any questions of me?

THE COURT:  I -- not at this time.

MS. NIMEROFF:  Okay.  That's --

THE COURT:  Let me ask --

MS. NIMEROFF:  That's all I have.

THE COURT:  All right.

MS. NIMEROFF:  Thank you, Your Honor.

THE COURT:  Thank you, Ms. Nimeroff.

Does anyone else wish to be heard?

(No verbal response)

THE COURT:  Okay.  Mr. Waxman, I'm sure you want to be heard.

(Participants confer)

MR. WAXMAN:  Thank you, Your Honor.  May it please the Court, Jeff Waxman of Morris James on behalf of the debtor.

There's a lot to unpack, Your Honor.  So excuse me as I kind of work through.  And there's -- I know it may appear a stream of consciousness --

THE COURT:  No, it's okay.

MR. WAXMAN:  -- but maybe it's even necessary, so -

-

THE COURT:  I may be stream of conscious, too -- consciousness, when we get to the end, so ...

MR. WAXMAN:  Oh, it's that hour, Your Honor.

I'd like to start off with a couple of (indiscernible)

First and foremost, there's nothing before Your Honor that addresses the (indiscernible) so that's not an issue for today.  I know Your Honor has said on many times I don't have anything before me on that issue and I know you're not going to rule on that today.  But I do just want to point that out in no small part because a lot of the discussions about timing for the plan and confirmation are triggered by, well, we should wait.  And that presumes that the allegations -- and they are only allegations at this point -- are correct.

What you're not hearing is -- and this applies to the Reed creditors as much as the U.S. Trustee, both of whom have said, well, this doesn't have a creditors' committee, there isn't the big cash burn.  Your Honor, if you look at the liquidation analysis, you will see the year one disposable income projection is only two hundred and twenty -- $242,000.

Mr. Balasiano, I believe, is charging the estate $25,000 a month.  Is that correct?

(Participants confer)

MR. WAXMAN:  Every month is now more than the disposable income that the debtor will make under the plan. Mr. Balasiano also has counsel.  He is also involved.  I have absolutely no doubt, if Mr. Balasiano is going to be the subject of a deposition, as will Ms. Gould, there is going to be significant expense.

I want everybody to keep in mind it cost $51,000 of the estate's money in connection with the committee motion that was filed by the Reed creditors.  The Reed creditors are now talking about wanting 30 days before we even -- the Reed creditors and the U.S. Trustee are talking about waiting until after the solicitation, so there's $25,000 burned before we even solicit.  And now the Reed creditors are talking about needing in excess of 30 days for discovery when we're going to burn through more money.

I just want to point out this is coming at the expense of unsecured creditors in a case that is not a case with a lot of money.  The more that is spent on administrative expenses, the less that's available for unsecured creditors.

Under the plan, which had a -- what I consider a conservative amount for administrative expenses, we're looking at two and a half to four percent on account of general unsecured claims.  If we have a ninety-day process,

which is what's been discussed today, having confirmation in January, I can pretty much guarantee that the best interests of creditors test is going to end at somewhere in the priorities, and that's unfortunate.

And then the other thing they -- this Court should bear in mind is this is a case that is centered around one contract.  It would be very easy for the debtor to simply fold, go Chapter 7, and presumably the underlying hospital could find another person to replace the debtor if the economic burden is so heavy that the debtor cannot meet its obligation because of the administrative expenses that are being forced upon it by one set of creditors, who is making an allegation -- nothing more -- mere allegations with respect to claims of a party other than itself.  I think that that's important.

And let's talk about the schedule for a second, the need for more time.  Again, the debtor is concerned about the cash burn.  The debtor does not have the luxury of being able to make choices that risk other people's money.  Obviously, the other party -- some of the other parties do not have that limitation.

The amended plan was filed nine or ten days ago, that had the lengthy and comprehensive Gould report.  We haven't heard anything about (indiscernible) we haven't heard anything about requesting a call with Ms. Gould to walk

through her analysis.  We haven't heard anything about speaking with Mr. Balasiano regarding, you know, his consideration of the issues.  That's nine days lost.  It could have been spent moving towards confirmation and emergence and reduction of administrative expenses.  Instead of talking about getting it done quickly, we're now talking about moving it to January, January of 2024.

The debtor hastened to meet the deadline required for filing a plan, despite switching counsel in the middle of the case, so that it could emerge quickly.  There was no motion that was sought (indiscernible) the debtor moved with the expediency necessary for a case of this size -- of this size, of this economic power to emerge quickly.  We are now talking about January and burning through cash.

THE COURT:  But Mr. Waxman, can I stop you there a second?

MR. WAXMAN:  I'm sorry, Your Honor.  I can barely hear you.

THE COURT:  Oh.  There was a comment made about Sherman Grace [sic].  How does the Sherman Grace Hospital bankruptcy play into this confirmation, if at all?

MR. WAXMAN:  The -- there's only one real aspect to it, and maybe two.  And I probably need to speak with Mr. Sarrao, who I failed to introduce to the Court today, he is in the first row.

Your Honor, there is at least two components to it, and I do want to confer with Mr. Sarrao --

THE COURT:  Okay.

MR. WAXMAN:  -- before concluding my comment.

The first is that there is a large claim between -- from Alecto as against Sherman/Grayson.

THE COURT:  Right.

MR. WAXMAN:  As Your Honor likely recalls --

THE COURT:  Sixty million?

MR. WAXMAN:  -- Alecto Healthcare is the single largest -- $60.5 million.  There was a demand made by the creditors' committee in Sherman/Grayson, the parties are discussing that.

So conclusion of that sale will result in $250,000 of which the heath -- excuse me -- Alecto Healthcare should receive, just based on the numbers, without any settlement, approximately 187,500.  So there is some result from that sale that will be a benefit to the estate.

THE COURT:  Okay.

MR. WAXMAN:  The second component of it is that there may be obligations assumed before we, the estate (indiscernible)

Let me check with Mr. Sarrao and make sure that I am correct about that and that there aren't any other tangible effects or economic effects from that sale.  If I

may have a moment, Your Honor?

THE COURT:  Certainly.

(Participants confer)

MR. WAXMAN:  Your Honor, there's one other -- there's one other component to it, which is there's the ongoing insurance that the debtor is fronting and that is being repaid.  There are other expenses like that, I believe. And that, obviously, gets rid of that obligation and uncertain connection (indiscernible) does that respond to --

THE COURT:  Yes.

MR. WAXMAN:  -- to your question, Your Honor?

THE COURT:  Yes.  Thank you.

So, Mr. Waxman, now that was responsive.  But I understand your argument about burn and I appreciate that. That is the only reason that the debtor is setting forth not to delay this.

MR. WAXMAN:  I'm sorry, Your Honor.  I couldn't hear you.

THE COURT:  The burn --

MR. WAXMAN:  Yes.

THE COURT:  -- the monthly burn is the debtor's primary argument why this shouldn't be adjourned or continued --

MR. WAXMAN:  That (indiscernible)

THE COURT:  -- or scheduled, but scheduled further

out.

MR. WAXMAN:  Well, that is perhaps not the only one, but that is certainly a primary driver, as is with almost every bankruptcy case.  I don't think you need to have much bankruptcy experience to recognize --

THE COURT:  No --

MR. WAXMAN:  -- that cash burn in cases, even where the debtor is not a melting ice cube, can be considerable, which, by the way, is the entire reason for Subchapter V.

THE COURT:  I appreciate that.

MR. WAXMAN:  I want to address one other thing, Your Honor, and I just want to point this out.  The releases that were discussed are not third-party releases; they're debtor releases.  This is a reorganization, Your Honor.  This is simply a flag that the debtor is not going to pursue against insiders.  There has been analysis of claims.  So I wanted to clarify that.

If I can have a moment, Your Honor.

(Pause in proceedings)

MR. WAXMAN:  Again, I do want to point the debtor doesn't object to the taking of discovery.  That's part of the process, the debtor understands that.  The debtor is not trying to limit that.  The debtor is trying to limit the amount of time that it takes for that to happen because emergence of a bankruptcy case -- emergence from the

bankruptcy case is fundamental, it's important and necessary, if only to start -- to stop the administrative burn and (indiscernible) distributions on account of (indiscernible)

In this case, there are going to be significant administrative expenses, including the Sub V Trustee, that are going to have to be paid.  And we're already looking, just based on the waterfall -- which, again, in the liquidation analysis, you have 242,000 in year one, 228,000 -- approximately 229,000 in year two, and then you're at 187,000 in year -- 164,000 in year three.  Notice the trend, Your Honor.  It's going down.  There's greater uncertainty.

And by the way, it's not inconsiderable and the Court should also consider there is a lifetime with this contract, it's not a perpetual contract.

THE COURT:  Right.

MR. WAXMAN:  It doesn't run out in five years.  I believe it runs out sometime during the third year.

THE COURT:  2025, is my recollection --

MR. WAXMAN:  Correct.

THE COURT:  -- from reading the plan.

MR. WAXMAN:  Correct.  So -- and again, it's going down.  Stringing this out just creates greater uncertainty going forward because now you're talking about, you know, not even completing, necessarily, the third year of plan.

But it is providing for all of the disposable

income and minimizes the administrative expenses relative to Chapter 7. This is actually a good result. If the case converted to Chapter 7, it is virtually certain at this point that there will be nothing for general unsecured creditors. And I could tell you that that would be a shame, particularly since the Reed creditors were offered a significant amount of money before they filed -- before this --

MR. SULLIVAN: Objection --

MR. WAXMAN: -- case was filed.

MR. SULLIVAN: -- Your Honor.

MR. WAXMAN: So -- and then they would receive nothing. So, for those reasons, Your Honor, we think expediency, relative expediency is important. I do not expect that --

THE COURT: I don't know what "relative expediency" means. Are you conceding to a mid-December date?

MR. WAXMAN: I think early December is reasonable, Your Honor, but I can't control Your Honor's calendar. I know that you are extremely busy. Getting an hour from chambers on the 29th for a confirmation hearing, we're not going to be able to complete it. Honestly, I would rather have it done in one day, rather than come back with little bites.

THE COURT: I would, too.

MR. WAXMAN: I think it's better for you and I

think it's better for the parties, I think it's better for the process.

If Your Honor has a complete day that's sometime in the first week in December, I think that would be the better --

THE COURT:  Well, I'm going to tell you all right now I'm out the beginning of December, so I can't do anything before December 14th.

MR. WAXMAN:  Your Honor, may I look at my calendar?

THE COURT:  Yes.  I -- actually, I'd like to take a quick break because I want to double-check my calendar, and I'll be right back.

MR. WAXMAN:  Thank you, Your Honor.

I do note that it's 5:20 --

THE COURT:  I know.

MR. WAXMAN:  -- and Your Honor said --

THE COURT:  I know.  If an IT person comes in here, just tell them to hold a few minutes.

(Laughter)

THE COURT:  Thank you.  And we'll be right back.

MR. WAXMAN:  Thank you, Your Honor.

(Recess taken at 5:20 p.m.)

(Proceedings resume at 5:33 p.m.)

(Call to order of the Court)

THE COURT:  Please be seated.

Thank you all for your patience. I wanted to look at a calendar and give some thought to this.

Look, I appreciate the creditors here had the opportunity to analyze the documentation that was attached to the plan and filed on October 9. And even the debtor here, I anticipate, said there are going to be discovery and depositions.

And I also appreciate that, although the matter is not before me, but as a matter of judicial economy and expense in this case, I don't want to go forward with solicitation while the U.S. Trustee and the Reed creditors analyze and potentially challenge eligibility.

So I'm going to continue this matter and I want to meet next Thursday at nine o'clock in the morning. And the reason for that discussion will be:

First, I want additional information regarding the Reed class, including a copy of the order certifying the class. And I want to know how the class representatives communicate with the class creditors because I very much appreciate Ms. Casey's comments here today about notice. And this may be something whereby there's a webpage or email. I just think that we need additional information before we make a decision in that regard. And I also want counsel to confer with respect to voting and notice to the Reed class.

So, look, I very much appreciate the debtor's burn

Case 23-10810-JKS   Doc 220   Filed 10/25/23   Page 67 of 73

67

argument in this case, but I also appreciate, on the other side, there's burn to solicit a plan that may not go forward. So, without making any judgments on anything, I want to meet next Thursday.  And I want the parties to be thinking about, assuming confirmation goes forward, that I will make time at the end of December for confirmation.

MR. WAXMAN:  Okay.  Your Honor, may I ask --

THE COURT:  Did you settle it when I left the room?

(Laughter)

MR. WAXMAN:  Of course I did, Your Honor, because you know that I'm nothing if not, you know, willing to be accommodating.

Speaking of which, Your Honor, may I impose upon Your Honor for a time later in the day than nine o'clock?  I will be out of the eastern time zone and we'd prefer not to have to wake up at -- before six o'clock in the morning and be able to speak reasonably.

THE COURT:  Bear with me a second.  I'm afraid, if I do it earlier in the week, you're not going to have any information.  And I'm curious how long an assessment on eligibility is going to take.

MR. WAXMAN:  Your Honor, I can tell you that there's been a discussion with my client and we don't see that there's an issue.  But obviously, the Reed creditors are going to do whatever they're going to do.  They're going to

make the arguments they're going to make.

THE COURT:  How about noon on the 26th?

MR. WAXMAN:  That is perfectly fine, Your Honor.

THE COURT:  And I'm -- I want to -- I have a 10, 11, and a 1 and a 2, so I'm, unfortunately, going to have to box you in that day, time-wise.

MR. WAXMAN:  Your Honor, I think an hour for that conference is better than an hour for a contested confirmation hearing, so --

THE COURT:  Okay.

MR. WAXMAN:  -- I'll take what I can get.

THE COURT:  And not -- and I'm looking at the schedule, too, with that in mind.  If we go forward with a contested confirmation hearing, I don't want to break it up into mini, small hearings.

MR. WAXMAN:  Your Honor, I -- that would not be good for Your Honor or any of the parties.  It would -- I anticipate that there will be multiple witnesses, and those witnesses will actually be here in person, unlike (indiscernible) so it gives certainty as to when the witnesses will need to appear and make arrangements ahead of time, et cetera.  So I appreciate the having a bigger block of time, rather than --

THE COURT:  Yeah.

MR. WAXMAN:  -- (indiscernible)

THE COURT:  Okay.  Mr. Sullivan?

MR. SULLIVAN:  Your Honor, I think you said -- what is it, the 26th?  Did I get that right?  That -- so --

THE COURT:  Hold on.

(Participants confer)

THE COURT:  Yeah, the 26th at noon.

MR. SULLIVAN:  At noon.  Okay.

THE COURT:  Does that work?

MR. SULLIVAN:  Yes.

So the other -- only other thing that I was trying to find out -- I didn't ask Mr. Waxman about it.  Are there any hearings currently scheduled in November in the omnibus --

(Participants confer)

THE COURT:  Oh, in this case?

MR. SULLIVAN:  In this case (indiscernible)

THE COURT:  Hold on one second.  Let me put this down before I forget.

(Participants confer)

MR. WAXMAN:  November 7th, I think we have one.  Your Honor, if I can just check my calendar?

THE COURT:  Yes, you do.  You have an 11 a.m.

MR. SULLIVAN:  On November 7th.

THE COURT:  And it's also with Sherman/Grayson --

UNIDENTIFIED:  Yes.

THE COURT: -- which, at this juncture, I'm not sure why those cases should tag team together.

MR. WAXMAN: Well, at least until the sale goes forward, I think having them -- at least until the sale goes forward, I think having them at the same time probably isn't the worst idea --

THE COURT: Okay.

MR. WAXMAN: -- if only because of the relationship between the parties.

THE COURT: Okay. Well, that's also the 9019, so I suspect that you all will be here anyway. I'm just looking at it -- I initially noted there were some admin expense claims scheduled, and I was thinking you might not want to sit through those, but --

MR. WAXMAN: Well, you're happy -- we're happy to be heard first, to the extent we have anything going forward, and being released (indiscernible)

THE COURT: So what is -- I'm sorry. I don't know what the purpose of asking about this date was? And I'm sorry if I'm lost my attention span.

(Laughter)

MR. SULLIVAN: Well, Your Honor, the -- in reviewing the issue on class certification -- I mean, class --

THE COURT: Eligibility?

MR. SULLIVAN:  -- Subchapter V eligibility.

THE COURT:  Right.

MR. SULLIVAN:  I'm sorry.

THE COURT:  I understand now.

MR. SULLIVAN:  Okay.

THE COURT:  Right.  And so we would know by then if we had -- if we're going forward on a Subchapter V plan, we could deal with it.

MR. WAXMAN:  Is that 30 days?

THE COURT:  It's the 7th.

(Participants confer)

MR. WAXMAN:  So you're still going to want to wait until after the 30 days.

(Participants confer)

MR. WAXMAN:  I'm happy to confer with counsel about that.

THE COURT:  Okay.  Confer.  And we have an hour to talk about it on the 26th.

MR. WAXMAN:  That's fine, Your Honor.

THE COURT:  Okay.

MR. WAXMAN:  We'll talk fast.

(Participants confer)

THE COURT:  It will be time because I'm confident i these talented attorneys, that you'll have the opportunity to speak and you can streamline it.

MR. WAXMAN:  Thank you, Your Honor.  And me, too.

THE COURT:  Okay.  Thank you all.

Is there anything else for today?

MR. WAXMAN:  I don't think so, Your Honor.  Thank you for your time.

THE COURT:  Certainly.

MR. WAXMAN:  Thank you for the Court's time.  And we will try to work to narrow the issues, and that's it.

THE COURT:  And if the debtor or any other party wants to file any supplemental -- and I'll say by letter -- on any of the issues raised today, including deemed rejected, please feel free.  But if you're going to do that, if you could get them to me, you know, by noon on the 25th, that would be great.

MR. WAXMAN:  That's fine, Your Honor.  I don't know that the debtor has any.  But again, we'll confer with the other parties and see where are the issues we disagree on.

THE COURT:  Okay.  Terrific.

Thank you all very much.  Have a good evening.  We stand adjourned.

(Proceedings concluded at 5:41 p.m.)

*****

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____     October 24, 2023

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable